453 So.2d 17 (1984)
James Armando CARD, Sr., a/K/a James T. Conte, a/K/a Mike Johnson, Appellant,
v.
STATE of Florida, Appellee.
No. 61715.
Supreme Court of Florida.
June 7, 1984.
Rehearing Denied July 19, 1984.
Certiorari Denied November 5, 1984.
*18 Steven L. Bolotin, Asst. Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
Jim Smith, Atty. Gen., and Richard A. Patterson, Asst. Atty. Gen., Tallahassee, for appellee.
Certiorari Denied November 5, 1984. See 105 S.Ct. 396.
ADKINS, Justice.
This case is before us on direct appeal from a conviction of first-degree murder, robbery and kidnapping and the sentence of death imposed on the appellant, James Card. The sentence by the trial judge followed a jury recommendation of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
We affirm both the conviction and sentence for the reasons expressed below.
On the afternoon of June 3, 1981, the Panama City Western Union office was robbed of approximately $1,100. Blood was found in the office and the clerk, Janis Franklin, was missing. The following day, Mrs. Franklin's body was discovered beside a dirt road in a secluded area approximately eight miles from the Western Union office. Her blouse was torn, her fingers severely cut to the point of being almost severed and her throat had been cut.
As early as 6:30 on the morning of June 3, 1981, the appellant telephoned an acquaintance, Vicky Elrod, in Pensacola, Florida, and told her that he might be coming to see her to repay the $50 or $60 he owed her. At approximately 9:30 that night Vicky Elrod met with the appellant. He took out a stack of twenty and one-hundred dollar bills and she asked if he had robbed a 7-Eleven store. He told her that he had robbed a Western Union station and killed the lady who worked there. He described scuffling with the victim, tearing her blouse and cutting her with his knife. He said he then took her in his car to a wooded area and cut her throat saying, "Die, die, die." Several days after their meeting, Vicky Elrod went to the police with this *19 information. The appellant was then arrested.

CONVICTION
The appellant contends that he should receive a new trial because the trial court erred in excluding certain proffered testimony, thereby depriving him of his fundamental right, guaranteed by the sixth and fourteenth amendments to the United States Constitution and by article I, section 16 of the Florida Constitution, to present witnesses in his own behalf.
The proffer demonstrated that Camille Cardwell would have testified that two or three weeks before the robbery she overheard four individuals, one of whom was her boyfriend, John Green, discussing a robbery they were going to commit. Neither Camille Cardwell nor any of the four individuals she overheard were connected with the appellant, James Card. The following is the testimony proffered by the defense:
COURT: All right, gentlemen, the jury's out. Mr. Green [defense counsel].
CAMILLE CARDWELL, having been duly sworn, testified as follows:
DIRECT EXAMINATION BY MR. GREEN:
Q. Would you state your name and address, please ma'am?
A. Camille Josephine Cardwell, PO Box 147, Lowell, Florida.
Q. Miss Cardwell, did you have occasion in the first part of June to speak to some law enforcement officers concerning the Western Union store robbery?
A. Yes, sir, I did.
Q. And to whom did you speak?
A. I believe the first name was Frank.
Q. And do you have any information regarding the Western Union store robbery?
A. Yes, sir.
Q. Will you tell the Court what information you do have?
HARRISON [prosecutor]: This is what I object to, because the only information she has she obtained through hearsay.
GREEN: Your Honor, this is a proffer, and I can tie it all in through the proffer, I believe.
COURT: No sense in getting any exercise. The jury's not in here. Let's hear what the girl has to say. We'll then determine whether the jury hears it. All right, Camille, tell us what you know about the robbery.
A. I flew in from Kansas the first part of May to be with my boyfriend at the time, and him and a couple of his friends were  had come in from somewhere, and I was sitting around, and they were talking about pulling off a robbery, and the only information that I really got as to what it might be was they they had said that they were going to rob a place where they would  people sent in money orders and stuff like that.
Q. Did they tell you they were going to rob the Western Union store?
A. Not in exact words. What they had said was that  Doc had some money coming in that his mother was wiring him.
COURT: Doc, Doc?
A. My boyfriend.
Q. What's his real name?
A. John Green.
COURT: John Green?
A. Yes, sir.
COURT: Okay, go ahead.
A. And he had said that he had been down there earlier and that they had looked the place over and that it would be a perfect place.
Q. Did they speak  did they have  you heard this conversation before June 3rd when the Western Union was robbed, did you not?
A. Yes, sir.
Q. How long before it?
A. I'm really not for sure. I flew back to Kansas, it was either the 18th or 19th of May, so it was before that.

*20 Q. So, was it about two or three weeks before June 3rd?
A. Yes, sir.
Q. Did they mention a time when they thought they might do the robbery?
A. They said they would like to get it before the banks closed and she made her deposits.
Q. Did they mention a specific time?
A. I believe they said anywhere from two to 3:30, somewhere along through there.
Q. Did they mention anything about using any type of weapons?
A. Doc had  John had mentioned using a knife  some of the knives that he had, scuba diving equipment, and he also had a shotgun.
Q. Did they tell you what type  or the knife, did you see any of their knives?
A. I've seen his knives before, yes, sir. I've done a lot of scuba diving with him.
Q. Who else was present when they were talking about that?
A. There was Tom Wilmot, Tom's wife, and 
Q. What's her name?
A. Breezy, and also another guy I don't know. I've never seen him before.
Q. Did they mention what type of  can you tell me what kind of automobile they had?
A. John owned a, I believe it was a '63 Chevrolet, and Tom owned a van.
Q. Did they say what they were going to do to the lady at the Western Union?
A. Well, from what I could pick up, they weren't going to hurt her.
Q. And you reported this to the police about June 5th.
A. Somewhere along in there.
GREEN: That's basically the proffer, Your Honor.
COURT: This is hearsay.
The appellant submits that the testimony was relevant because it "tends to prove that" someone other than the appellant may have committed the crime and because "[I]t casts doubt on the police officers' testimony that they followed up all leads and ruled out all possible suspects but [the appellant]." He further argues that the testimony is not hearsay, but in the alternative, if it is, it should have been admitted under the hearsay exception which allows declarations against penal interest to be introduced in evidence. See § 90.804(2)(c), Fla. Stat. (1981).
Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. § 90.801(1)(c), Fla. Stat. (1981). The appellant contends that Camille Cardwell's testimony is not hearsay because the conversation she heard is not being offered to prove the truth of the matter asserted. It is, he contends, a verbal act, indicative of a specific criminal intent and it is highly relevant in that it tends to prove that Green and Wilmont, rather than the appellant, may have committed the crime.
We find this argument insupportable. The declarants are not defendants or victims nor are they connected with this case other than through the proffered testimony at issue. The only way any statements made by them could be relevant here would be if they were offered for the truth of the matter asserted. Only if the testimony were offered to prove that the declarants were actually planning a robbery of a Western Union office would it be relevant. The criminal intentions or states of mind alone of these declarants are irrelevant to this case. The statements were obviously offered as proof of the matter asserted and are, therefore, hearsay.
The appellant also contends that the testimony was admissible to impeach the credibility of the police investigations. We are unable to find merit in that contention. The investigators have not denied receiving the information from Camille Cardwell. The appellant has offered no plausible demonstration of a failure to investigate the crime.
*21 In the alternative, the appellant argues that if the proffered testimony is hearsay, it should have been admitted as a declaration against penal interest. Section 90.804(2)(c), Florida Statutes (1981), requires that in order to utilize this exception to the hearsay rule, the appellant must demonstrate that the declarant is unavailable to testify as a witness. He has not done so in this case but contends that the testimony was admissible in spite of the unavailability requirement. He bases this on the due process principles set forth in Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).
In Chambers, the Court held that "[U]nder the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." 410 U.S. at 303, 93 S.Ct. at 1050. In that case, the defendant was tried in Mississippi for the murder of a police officer. Another individual made three verbal confessions to this crime and one written confession which he later repudiated. The prosecution did not call this declarant as a witness so the defense did. At that time, under the "voucher" rule in Mississippi, one could not impeach one's own witness. Therefore, the defense was not allowed to have the verbal confessions admitted into evidence for that purpose. In addition, the hearsay rule prevented the testimony from being heard and Mississippi had no exception to the rule based on declarations against penal interest. The Court said in that case:
The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability. First, each of [declarant's] confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case... .
Id. at 300, 93 S.Ct. at 1047. The Court further stated that it was establishing no new standards of constitutional law, nor was it diminishing the authority of the states over their own trial rules. Rather, under the specific facts of this case, where the rejected evidence bore persuasive assurances of trustworthiness, its rejection denied the defendant a trial in accordance with due process standards. Id. at 302, 93 S.Ct. at 1049.
We find no similarity between the instant case and Chambers. This case does not involve a confession to the specific crime but, rather, a discussion, prior to the crime, about committing a similar crime. There is no corroborating evidence and no assurances whatever of the reliability of the statement. Also, section 90.804(2)(c), Florida Statutes (1981), states:
A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.
We find that the appellant was not denied a fair trial by exclusion of the hearsay evidence.

SENTENCE
The trial court made the following findings of fact as to the aggravating circumstances of the case:
1. The murder was committed while the Defendant was engaged in the commission of a kidnapping. (F.S. 921.141(5)(d)). The murder was also committed while the Defendant was engaged in the commission of a robbery. The Defendant went to the Western Union on June 3, 1981 and kidnapped the victim, Janis Franklin, after robbing the business of approximately $1,197.00. The crime of kidnapping was accomplished when the victim was forced at knife-point to leave the premises of Western Union.
2. The murder was committed for the purpose of avoiding or preventing a lawful arrest. (F.S. 921.141(5)(e)). The dominant motive for the kidnapping and murder of Janis Franklin was the elimination of the only witness to the defendant's crime. The evidence has established that Janis Franklin knew the defendant and would clearly have been able to identify him as the robber of the Western *22 Union. For that reason she was driven to an isolated area and murdered.
3. The murder was committed for pecuniary gain. (F.S. 921.141(5)(f)). The Court is aware of the prohibition of considering both the robbery as an aggravating circumstance and whether the crime was committed for pecuniary gain as an aggravating circumstance. However, the aggravating circumstance of F.S. 921.141(5)(d), already discussed above, is considered applicable because the murder was committed during the course of a Kidnapping. Under the total circumstances the fact that a Robbery also occurred does not prevent the Court from considering the pecuniary gain aspect of the crime.
The fact that this crime was committed for pecuniary gain is without doubt. The defendant took $1,197.00 at knife-point.
4. The murder was especially heinous, atrocious or cruel. (F.S. 921.141(5)(h)). The acts of this defendant and the obvious torture and suffering of the victim set this crime apart from the norm of capital felonies. This defendant entered the Western Union, a family business, in Panama City, Florida. He removed a knife from his pants and attacked the clerk, Janis Franklin. She made a valiant effort to fend off her attacker; and, as a result of his initial attack, Janis' fingers on both hands were severely cut. Some fingers were almost completely severed from the hands. The Defendant ordered Janis out of the Western Union with that same knife to her back. In this severely injured condition she was taken on a death ride for approximately eight miles to an indistinct dirt road in an isolated, secluded area of Bay County. She was told to exit the vehicle and was promised she would not be harmed further. The Defendant then [exited] from the driver's side, came around the vehicle and silently approached Janis from behind. He grabbed her by the hair of the head, pulled her head back, and slit her throat. He then stood over her watching her bleed and uttered his final words to her, "[D]ie, die, die."
The evidence established that the wound was vicious, that it completely severed the windpipe and the right side jugular vein, and that the defendant's knife actually left its mark on the neck bone itself.
The suffering of Janis Franklin prior to her death can barely be comprehended by those of us [among] the living. Those minutes before her death, while she was nursing her almost severed fingers and while she was being driven to this isolated area, was a time of complete and total terror. Then, for a few seconds, Janis Franklin had that slight ray of hope when she was told she would not be harmed further, only to be grabbed from behind and to realize that her life was ended.
This Court can think of no crime more wicked or vile. The evidence is clear that this defendant committed this heinous and atrocious crime upon Janis Franklin with no feelings for her suffering and even with a degree of enjoyment in slashing her throat.
5. The murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. (F.S. 921.141(5)(i)). As early as 6:30 on the morning of June 3, 1981 the Defendant telephoned Vicky Elrod in Pensacola and related that he would repay her a sum of $50.00 or $60.00 that he owed her. His course for that fatal day was then [charted]. The evidence reflects that he was a regular customer of the Western Union, that he knew the location of the money and volume of business conducted there. He prepared for his crime by wearing surgical gloves and hiding his knife inside his pants. After completion of the Robbery he kidnapped the victim and murdered her, thus disposing of the only witness to his crime. He [proceeded] to dispose of the gloves, the knife, the victim's wallet, and, at a later time, a silver coin, all of which could have connected him to the crime. The evidence established that he *23 knew the tire tracks could connect him to the crime scene. He even attempted to get a witness to trade tires with him. There was much time for the Defendant to reflect on the seriousness of his acts, to plan his acts, and to realize the penalty for his acts. The evidence leaves no doubt that the crime was planned and premeditated and that the murder was carried out on a cold and calculated manner.
After considering all of the evidence in the case, the court found no mitigating circumstances.
Appellant contends that the trial court erred in finding the fifth aggravating circumstance (cold, calculated, and premeditated commission) because it was not proven beyond a reasonable doubt. Appellant also contends that the trial judge improperly gave double consideration to the aggravating circumstances concerning a killing "for the purpose of avoiding lawful arrest" and "for pecuniary gain". Finally, appellant asserts that the trial judge failed to give proper weight to the evidence offered in mitigation. Appellant does not contest the first and fourth aggravating circumstances found.
It is a requirement that aggravating circumstances be proven beyond a reasonable doubt to be proper considerations in the sentencing decision. Williams v. State, 386 So.2d 538 (Fla. 1980); Alford v. State, 307 So.2d 433 (Fla. 1975), cert. denied, 428 U.S. 912, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1976). The appellant asserts that because of the testimony of a clinical psychologist during the penalty phase in which the psychologist stated that he felt that Card evidenced a sociopathic personality, reacted impulsively and had little awareness of consequences, that it was not proven beyond a reasonable doubt that the murder was committed in a cold, calculated and premeditated manner.
We find no merit to the contention that the psychologist's testimony precluded a finding beyond a reasonable doubt in this issue. It is the province of the court to determine the weight to be given to the testimony in the sentencing phase. Smith v. State, 407 So.2d 894 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982). The judge took into account the psychologist's testimony and the fact that the appellant has a sociopathic personality. He weighed this against the facts of the case and it is not within our province to reweigh the testimony now. After reviewing the facts of this case, we find that the circumstance of cold, calculated premeditation was properly applied.
In Jent v. State, 408 So.2d 1024 (Fla. 1981), cert. denied, 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982), the appellant alleged that every person convicted of premeditated murder will start the sentencing proceeding with one aggravating circumstance already established. This Court concluded that this would not be the case because the level of premeditation needed to convict in a first-degree murder trial does not necessarily rise to the level of premeditation in section 921.141(5)(i). In other words, the premeditation must rise to a level beyond that which is required for a first-degree murder conviction. See, e.g., Hill v. State, 422 So.2d 816 (Fla. 1982), cert. denied, 460 U.S. 1017, 103 S.Ct. 1262, 75 L.Ed.2d 488 (1983) (victims were stripped, beaten and tortured over a period of hours before being killed); Middleton v. State, 426 So.2d 548 (Fla. 1982), cert. denied, ___ U.S. ___, 103 S.Ct. 3573, 77 L.Ed.2d 1413 (1983) (where defendant sat for hours holding a shotgun and thinking about killing the victim); Jent v. State (involving a lengthy series of events including beating, transporting, raping, and setting the still living victim on fire); Combs v. State, 403 So.2d 418 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2258, 72 L.Ed.2d 862 (1982) (victim was lured to murder site under false pretenses).
In the instant case, the appellant took the victim from the Western Union office, after having cut her fingers, transported her in his car to a secluded area eight miles away, had her get out of the car, and then cut her throat. The appellant had ample *24 time during this series of events to reflect on his actions and their attendant consequences. We find that the facts of this case demonstrate the heightened level of premeditation required by Jent.
Next, the appellant contends that the trial judge improperly gave double consideration to the aggravating circumstances concerning killing "for the purpose of avoiding lawful arrest" and "for pecuniary gain". We disagree with this argument.
It is clear from the record that avoidance of lawful arrest was an element involved in this murder. The appellant knew the victim and she could have identified him. In addition, the murder was the culmination of a series of interrelated events stemming from the act of taking money from the Western Union office. The trial judge was aware, as he states in his sentencing report, that it would be improper to find that the murder was committed in the course of a statutorily enumerated offense based on the robbery and that it was committed for pecuniary gain, also based on the robbery. Menendez v. State, 419 So.2d 312 (Fla. 1982); Clark v. State, 379 So.2d 97 (Fla. 1980), cert. denied, 450 U.S. 936, 101 S.Ct. 1402, 67 L.Ed.2d 371 (1981). However, the trial court found that this murder was committed during a statutorily enumerated offense based on the kidnapping. We have held that when the murder is the ultimate result of a closely connected chain of events, which originated with a robbery, it is proper to find that the murder was committed for pecuniary gain and was committed in the course of a kidnapping. Stevens v. State, 419 So.2d 1058 (Fla. 1982), cert. denied, ___ U.S. ___, 103 S.Ct. 1236, 75 L.Ed.2d 469 (1983) (a convenience store robbery after which, the cashier was abducted, raped and murdered). We cannot say that because the murder was committed to avoid lawful arrest, it cannot also have been committed for pecuniary gain. Of course the trial court can apply more than one aggravating circumstance to the same murder.
The appellant's final argument is that the trial judge failed to give proper weight to the psychologist's testimony which was offered in mitigation. Though the appellant admits that the judge was not required to agree with the testimony that the appellant's emotional or mental condition rose to the level required for the statutory mitigating circumstances, he contends that it was required that it be given some weight as nonstatutory mitigation. The trial judge stated the following in his sentencing report:
The Court has taken into account the testimony of Dr. Hord and finds that the defendant is apparently a sociopathic personality. It is contended that this testimony establishes that the defendant was under extreme mental or emotional disturbance at the time of the commission of the offense and that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The Court finds, however, that the testimony of Dr. Hord does not establish any particular mitigating circumstance. Even if the Court determined that each mitigating factor raised by the [d]efendant had been established, that would not outweigh the overwhelming evidence of aggravating circumstances prevalent in the testimony.
We will not overturn the reasoned judgment of the trial judge. See Smith v. State.
We find that no issue raised warrants reversal of the trial court's judgment. We hereby affirm the conviction and sentence.
It is so ordered.
ALDERMAN, C.J., and BOYD, OVERTON, McDONALD, EHRLICH and SHAW, JJ., concur.