803 So.2d 613 (2001)
James Armando CARD, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-182.
Supreme Court of Florida.
October 11, 2001.
Rehearing Denied December 20, 2001.
*616 Steven L. Seliger of Garcia and Seliger, Quincy, FL, for Appellant.
*617 Robert A. Butterworth, Attorney General, and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
James Armando Card appeals his sentence of death following resentencing. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Card's death sentence.

I. PROCEDURAL HISTORY
Card, who was thirty-four years old at the time of the crimes, was convicted of first-degree murder, robbery, and kidnapping and was sentenced to death. This court affirmed. However, in postconviction proceedings, the trial court vacated his sentence of death after an evidentiary hearing based on an improper procedure used in permitting the State to prepare the original sentencing order.[1] After a new penalty phase hearing before a new jury, the trial court imposed the death penalty.

II. MATERIAL FACTS
On Card's direct appeal, the Court related the following material facts:
On the afternoon of June 3, 1981, the Panama City Western Union office was robbed of approximately $1,100. Blood was found in the office and the clerk, Janis Franklin, was missing. The following day, Mrs. Franklin's body was discovered beside a dirt road in a secluded area approximately eight miles from the Western Union office. Her blouse was torn, her fingers severely cut to the point of being almost severed and her throat had been cut.
As early as 6:30 on the morning of June 3, 1981, the appellant telephoned an acquaintance, Vicky Elrod, in Pensacola, Florida, and told her that he might be coming to see her to repay the $50 or $60 he owed her. At approximately 9:30 that night Vicky Elrod met with the appellant. He took out a stack of twenty and one-hundred dollar bills and she asked if he had robbed a 7 Eleven store. He told her that he had robbed a Western Union station and killed the lady who worked there. He described scuffling with the victim, tearing her blouse and cutting her with his knife. He said he then took her in his car to a wooded area and cut her throat saying, "Die, die, die." Several days after their meeting, Vicky Elrod went to the police with this information. The appellant was then arrested. *618 Card v. State, 453 So.2d 17, 18-19 (Fla. 1984). The testimony at the resentencing proceeding established these same facts.
Additionally at the resentencing proceeding, the prior testimony of the medical examiner, Dr. Edmund Kielman, who had performed the autopsy of Franklin, was read to the jury.[2] According to Dr. Kielman's prior testimony, the victim suffered several defensive wounds and had a "very deep cut over her throat." The medical examiner stated that the wound to the victim's throat was approximately six or seven inches in length. The wound was also approximately two-and-one-half inches deep and almost went to the spinal cord. He opined that the perpetrator must have used a considerable amount of force in inflicting the wound to the victim's throat and that the instrument utilized by the perpetrator had to be fairly sharp to go that deep. The medical examiner also observed that the victim had suffered extensive wounds to her hands. The medical expert testified that these were classic defense wounds caused by the person protecting himself or herself from an attack.
In Card's defense, Card's attorney presented the testimony of several members of Card's family, including his mother, brother-in-law, ex-wife, daughter, niece, and brother. They testified about, among other things, Card's difficult childhood, his unstable family environment, his military service, and his achievements in prison. Defense counsel also presented the testimony of a Catholic priest, the director of a Catholic charity, and a Catholic sister. They testified about Card's religious beliefs, his commitment to Catholicism, his artwork, and how Card began writing to school children while in prison in an effort to deter young children from crime.
Defense counsel also presented the testimony of a professor of psychology at the University of Santa Cruz, Dr. Craig Haney, who testified about how he analyzed and evaluated Card's social history in an effort to understand or explain Card's criminal behavior. Doctor Haney opined that given Card's background, which included growing up in poverty, being abandoned by his father prior to birth, and suffering physical and emotional abuse and parental neglect, it was predictable that Card would use drugs and alcohol and engage in behavior that would lead him to prison. Doctor Haney also testified that Card had a good prison record and that, despite Card's past, he had adjusted well to prison life.
At the conclusion of the resentencing proceedings, the jury recommended the death penalty by a vote of eleven to one. In imposing the death penalty, the trial court found five aggravating factors: (1) the murder was committed while the defendant was engaged in the commission of a kidnapping; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest; (3) the murder was committed for pecuniary gain; (4) the murder was especially heinous, atrocious, or cruel ("HAC"); and (5) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification ("CCP"). The trial court found no statutory mitigating factors, but did find seven nonstatutory mitigators: (1) Card's upbringing was "harsh and brutal" and his family background included an abusive stepfather (some weight); (2) Card has a good prison record (slight weight); (3) Card is a practicing Catholic and made efforts for other inmates to obtain religious services (some weight); (4) Card was abused as a child (some weight); (5) Card served in the *619 Army National Guard and received an honorable discharge (some weight); (6) Card has artistic ability (little weight); and (7) Card has corresponded with school children to deter them from being involved in crime (some weight). The trial court found that the aggravating circumstances outweighed the mitigating circumstances and imposed a death sentence.
On appeal, Card raises twelve issues with regard to his death sentence.[3]

III. ANALYSIS

A. RECUSAL OF TRIAL JUDGE
Card argues that Judge Costello, the resentencing judge, improperly denied his motion for recusal because she incorrectly applied the recusal standard for a successor judge when she should have applied the more liberal standards for recusal that apply to an initial judge. There is no question in this case that there was a prior recusal of the first judge. However, Card and the State dispute whether Card's motion to recuse Judge Costello constituted a first or successive recusal motion for purposes of Florida Rule of Judicial Administration 2.160, because the prior judge recused himself "sua sponte" after denying Card's motion to recuse based on a finding that the allegations for recusal were not legally sufficient.[4]
The standards for recusal vary in that in an initial motion, the judge passes only on the legal sufficiency of the allegations and not on the truth of the facts, whereas, a successor judge may pass on the truth of *620 the facts alleged in support of the motion and need only be disqualified if "he or she is in fact not fair or impartial." Fla. R. Jud. Admin. 2.160(f). In this case, Card does not claim that the trial judge was actually partial. Moreover, we note that the entire motion to disqualify was based on an alleged consultation between a potential State witness, Debra King, and Judge Costello that took place prior to the time Judge Costello became a circuit court judge. However, King never testified at trial. Therefore, the potential basis for recusal never even materialized.
We do not reach the issue of whether in fact Judge Costello properly applied the standards for recusal as a successor judge because we conclude that Card waived any objection on this basis by not raising it at the time Judge Costello ruled on the motion as a successor judge or when the order was entered prior to the commencement of trial.[5] Defense counsel claims that the specific objection was preserved by raising it in a motion for new trial. However, had defense counsel disputed Judge Costello's status as a successor judge, it was incumbent on him to bring it to the trial judge's attention at the time the order denying the motion for recusal was entered prior to the commencement of trial, rather than waiting until the trial was over and the death penalty imposed. Accordingly, we deny Card relief on this claim.

B. CLOSING ARGUMENT
Card next asserts that the State's closing argument was permeated with improper and inflammatory comment that tainted the jury's recommendation and rendered the sentencing proceeding fundamentally unfair. Card admits that although defense counsel objected to some of the State's improper arguments, defense counsel did not object to others. Nevertheless, Card contends that the cumulative effect of the objected-to and unobjected-to comments deprived Card of a fair penalty phase hearing.

1. PRESERVED CLOSING ARGUMENT CLAIMS
We first examine the arguments that Card properly preserved for appellate review. The prosecutor argued that the jury should not recommend a life sentence because there was no guarantee that Card actually would be imprisoned for life, stating: "And there is nobody [that] can say that life is going, that he is going to serve a life sentence. No one can guarantee you that. No one can predict that." Defense counsel objected and moved for a mistrial. The trial court denied the motion for a mistrial but sustained the objection and provided jurors with a curative instruction, *621 informing them to disregard the prosecutor's comments and that "there is no parole. There is no early release from the sentence on a life sentence." In addition, the jurors were instructed that life without the possibility of parole meant "life, natural life of a person, no parole."
Card also objected to the prosecutor's argument pertaining to the victim impact testimony in which the prosecutor stated:
One other thing, and the law that the judge is really not going to give you much instruction on it and that's victim impact evidence. It doesn't fit in this formula and there is no way that you can weigh it. But I suggest to you that you can....
Defense counsel immediately objected to this argument, stating that the prosecutor was inviting jurors "to weigh something that is not an aggravating factor, is not under the statute ... he is inviting them to weigh it." Defense counsel also renewed his motion for a mistrial that he initially made following the State's improper argument that Card may not spend the rest of his life in prison if jurors recommended a life sentence. The trial court denied the renewed motion for a mistrial, but directed the State not to invite jurors to weigh victim impact evidence and to be careful "not to imply that they should weigh it."
Card also contends that the prosecutor improperly appealed to the jury's fears and emotions by referring to the jury as the "conscience of the community":
[I]n light of all of the other circumstances, the aggravating and the mitigating and when you're through [in weighing the evidence] you will not only be justified but warranted in recommending a sentence of death against this man for that heinous, atrocious and cruel, pitiless, vile, wicked premeditated robbery, kidnapping and murder. You are the conscience of this community.
(Emphasis supplied.) Defense counsel immediately objected and requested a mistrial, stating, "He cannot make the conscience of the community argument. He is trying to provoke a mistrial in this case.... That has been held many times to be an inappropriate closing argument." The trial court denied defense counsel's motion for a mistrial, stating, "It is the old send a message speech that is a problem so I don't find anything objectionable" regarding the "conscience of the community" argument.
In reviewing Card's closing argument claims, we must determine whether the trial court abused its discretion in denying Card's motions for mistrial. See Goodwin v. State, 751 So.2d 537, 546 (Fla. 1999). As this Court has stated, a trial court should grant a mistrial only "when it is necessary to ensure that the defendant receives a fair trial." Id. at 547.
Having reviewed the prosecutor's arguments, we conclude that the trial court did not abuse its discretion in failing to grant a mistrial with respect to the prosecutor's comments. See Goodwin, 751 So.2d at 546. Although the prosecutor's comments pertaining to whether Card actually would serve a life sentence[6] and informing jurors that they could weigh the victim impact evidence as aggravation[7] *622 were improper, the trial court sustained defense counsel's objections and, in the case of the comments pertaining to whether Card would actually serve a life sentence, gave specific curative instructions.
With regard to the "conscience of the community" argument, we find that this does not amount to reversible error. The prosecutor's reference to the term was isolated and the prosecutor did not continue with the argument after the defense lawyer made an objection. Thus, given the context of the prosecutor's limited reference to the phrase "conscience of community" during closing argument in the penalty phase of a death penalty case where the jury is charged with determining the sentence, we hold that the trial court did not abuse its discretion in refusing to grant a mistrial, as the comments were not so prejudicial as to vitiate the entire trial. Accordingly, we deny relief on this claim.

2. UNPRESERVED CLOSING ARGUMENTS CLAIMS
As a general rule, the failure to raise a contemporaneous objection when improper closing argument comments are made waives any claim concerning such comments for appellate review. See, e.g., Brooks v. State, 762 So.2d 879, 898 (Fla. 2000); McDonald v. State, 743 So.2d 501, 505 (Fla.1999). A timely objection allows the trial court an opportunity to give a curative instruction or to admonish counsel for making an improper argument. See Nixon v. State, 572 So.2d 1336, 1341 (Fla. 1990). The exception to the contemporaneous objection rule is where the unobjected-to comments rise to the level of fundamental error, which has been defined as error that reaches down into the validity of the trial itself to the extent that a verdict of guilty or jury recommendation of death could not have been obtained without the assistance of the alleged error. See McDonald, 743 So.2d at 505 (quoting Urbin, 714 So.2d at 418 n. 8); Chandler v. State, 702 So.2d 186, 191 n. 5 (Fla.1997) (holding that for an error to be raised for the first time on appeal, the error must be so prejudicial as to vitiate the entire trial). Having reviewed the unobjected-to comments made by the prosecutor in this case, we conclude that none of these comments constitute fundamental error.
We also have carefully reviewed the entire closing argument with specific attention to the objected-to arguments and the unobjected-to arguments that Card now contends were improper. We do not examine allegedly improper comments in isolation. Rather, the Court examines the totality of the errors in the closing argument and determines whether the cumulative effect of the numerous improprieties deprived the defendant of a fair penalty phase hearing. See Muhammad v. State, 782 So.2d 343, 361 (Fla.2001), cert. denied, ___ U.S. ___, 122 S.Ct. 87, 151 L.Ed.2d 49 (2001); Brooks, 762 So.2d at 899; Ruiz v. State, 743 So.2d 1, 7 (Fla. 1999); Gore v. State, 719 So.2d 1197, 1203 (Fla.1998).
Upon consideration of the State's remarks made during the State's penalty phase closing argument, taken both individually and collectively, we conclude that Card is not entitled to a new resentencing proceeding. In the present case, although the prosecutor crossed the line of proper advocacy during closing argument, defense *623 counsel failed to object to the majority of the improper arguments. Moreover, when the prosecutor engaged in improper argument and defense counsel objected, other than the "conscience of the community" argument, the trial court sustained the objections and, with regard to the comments pertaining to whether Card would actually serve a life sentence, appropriately cautioned the jury. Further, the trial court found five aggravating circumstances, including CCP and HAC, two of the "most serious aggravators set out in the statutory sentencing scheme," Larkins v. State, 739 So.2d 90, 95 (Fla.1999), no statutory mitigation, and insignificant nonstatutory mitigating circumstances. Accordingly, we hold that closing argument errors did not compromise the integrity of the judicial process and did not deprive Card of a fair penalty phase hearing. Therefore, we deny relief on Card's closing argument claims.

C. AGGRAVATING CIRCUMSTANCES
In the present case, the trial court instructed the jury on the following four aggravating circumstances and found that they were established by the evidence: CCP, HAC, avoiding or preventing a lawful arrest, and pecuniary gain. Card contends that the trial court erred both in instructing the jury on these aggravators and in finding these aggravators. We disagree.

1. CCP
We reject Card's claim that the trial court erred in finding and weighing CCP, as this Court already considered and denied this claim in Card's initial direct appeal.[8]See Card, 453 So.2d at 23. At Card's resentencing proceeding, the State presented the same evidence with regard to this aggravating circumstance that was presented at Card's initial sentencing proceeding. Because no new evidence was presented after the remand, we reach the same conclusion based upon our review of the new record on resentencingthat the trial court did not err in finding the CCP aggravating circumstance.[9]See also Reese v. State, 768 So.2d 1057, 1059 (Fla.2000) (denying defendant's challenge to the CCP aggravator on the ground that "[b]ecause *624 no new evidence was presented after the remand in the present case, nothing has changed since this Court's previous affirmance of CCP"). Accordingly, we deny relief on this claim.
We also reject Card's related claim that the trial court erred in denying his request that the trial court give the following special jury instruction pertaining to CCP: "Heightened level of planning a robbery, even if it does exist, does not establish a heightened premeditation for murder." The decision on whether to give a particular jury instruction is within the trial court's discretion, and, absent "prejudicial error," such decisions should not be disturbed on appeal. Goldschmidt v. Holman, 571 So.2d 422, 425 (Fla.1990); see Alston v. State, 723 So.2d 148, 159 (Fla. 1998) (holding trial court did not abuse its discretion in denying defendant's request for a special jury instruction); James v. State, 695 So.2d 1229, 1236 (Fla.1997) (stating that a trial court has wide discretion in instructing the jury and that the court's rulings on the instructions given to the jury are reviewed with a presumption of correctness). In the present case, the trial court gave jurors the standard CCP instruction, and we hold that the trial court did not abuse its discretion in denying Card's request for an alternative jury instruction.

2. HAC
This Court has held that a finding of HAC "is proper only in torturous murdersthose that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another." Brown v. State, 721 So.2d 274, 277 (Fla.1998). The HAC aggravator "focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death." Id. As in Rogers v. State, 783 So.2d 980, 994 (Fla.2001), this Court has upheld the HAC aggravator in numerous cases where the victim suffered multiple stab wounds, none of which caused instantaneous death, and the victim proceeded to bleed to death. See also Mahn v. State, 714 So.2d 391, 399 (Fla. 1998); Williamson v. State, 681 So.2d 688, 698 (Fla.1996); Finney v. State, 660 So.2d 674, 685 (Fla.1995).
In the present case, the trial court found that the following facts supported the HAC aggravator:
The defendant entered the Western Union run by Ms. Franklin and her family. The defendant armed himself with a knife, attacked Ms. Franklin and while she attempted to restrain him and defend herself, the fingers on both of her hands were severely cut. Her hands were bleeding, several fingers on her right hand were almost completely severed from her hand and her blouse was torn. While suffering from the shock of the loss of blood and the pain from the cuts, Ms. Franklin was forced into a car and driven eight miles to an isolated area and forced to leave the car. Although she was promised she would not be harmed further, the defendant approached her from behind, grabbed her hair, pulled her head back and slit her throat. The cut to the throat was two and one-half inches deep. It also severed her windpipe and her esophagus and even cut into the bone itself. The defendant stood over her watching her bleed. The crime was particularly wicked and vile because Ms. Franklin knew her attacker, had to suffer during the long drive from the wounds to her hands and must have been traumatized and terrorized during this whole process. She was grabbed from behind and suffered the final vicious attack by this *625 defendant. The defendant told Vicki Elrod that he even enjoyed it.
We hold that there is competent substantial evidence in the record to support the trial court's instruction and finding of HAC. See Bates v. State, 750 So.2d 6, 18 (Fla.1999); Cave v. State, 727 So.2d 227, 229 (Fla.1998); Preston v. State, 607 So.2d 404, 410 (Fla.1992).

3. AVOIDING OR PREVENTING A LAWFUL ARREST
The facts supporting commission of murder to avoid arrest must focus on the defendant's motivation for the crime. See Rodriguez v. State, 753 So.2d 29, 48 (Fla.2000). In order to establish that the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, the evidence must prove beyond a reasonable doubt that the sole or dominant motive for the killing was to eliminate a witness. See Zack v. State, 753 So.2d 9, 20 (Fla.2000); Consalvo v. State, 697 So.2d 805, 819 (Fla.1996). Mere speculation on the part of the State that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator. See Consalvo, 697 So.2d at 819. "Likewise, the mere fact that the victim knew and could identify the defendant, without more, is insufficient to prove this aggravator." Id. This Court repeatedly has affirmed the finding of the avoiding arrest aggravator in cases where "the victim is transported to another location and then killed." Jones v. State, 748 So.2d 1012, 1027 (Fla.1999) (upholding application of the avoiding arrest aggravator where the defendant robbed the victim at an ATM card machine and subsequently took the victim to a remote, wooded area and killed her); see also Preston, 607 So.2d at 406, 409 (upholding the trial court's findings of the avoiding arrest aggravating circumstance where the defendant robbed and kidnapped a victim from a convenience store and transported her to a remote location where he stabbed her); Swafford v. State, 533 So.2d 270, 276 (Fla. 1988) (upholding application of avoid arrest aggravator where defendant robbed gas station then took attendant to a remote area where he raped and shot her); Cave v. State, 476 So.2d 180, 188 (Fla.1985) (upholding aggravator where victim was kidnapped from a store and taken thirteen miles to a rural area where she was robbed and killed).
In the present case, the trial court relied on the following facts to support a finding of this aggravating circumstance: (1) the defendant was acquainted with the victim and, in fact, he had sent her an Easter card that was still on the wall of her office in June when this robbery and murder occurred; (2) after attacking and robbing the victim at the Western Union, Card kidnapped the victim and drove her to a secluded area eight miles away where he slashed her throat; and (3) in committing his crimes, Card wore gloves and was not wearing a mask. We conclude that there is competent substantial evidence in the record to support the aggravator that Card committed murder to eliminate the only witness to his crimes. See Jones, 748 So.2d at 1027; Preston, 607 So.2d at 406, 409; Swafford, 533 So.2d at 276; Cave, 476 So.2d at 188; Card, 453 So.2d at 24. Therefore, we affirm the trial court's findings with regard to this aggravating circumstance.

4. PECUNIARY GAIN
Card contends that the trial court erred in applying the pecuniary gain aggravating circumstance in this case. Card claims that the pecuniary gain aggravator is only applicable where the State proves that pecuniary gain was the sole or dominant motive in the murder. Thus, Card argues *626 that in this case it is inconsistent to apply both the pecuniary gain and the avoiding arrest aggravator, which requires the State to demonstrate that the motive for the killing was to eliminate a witness.
We rejected this claim on Card's initial direct appeal and, again, hold that it is proper for a trial court to utilize both the pecuniary gain and avoiding arrest aggravators in the same case. See Thompson v. State, 648 So.2d 692, 695 (Fla.1994); Card, 453 So.2d at 24. Accordingly, because Card stole $1,197 from the Western Union office and used some of the proceeds to repay a debt owed to Vicky Elrod, we hold that there is competent substantial evidence in the record to support the pecuniary gain aggravating circumstance.

D. MITIGATING CIRCUMSTANCES
Card contends that the trial court failed to satisfy the dictates of Campbell v. State, 571 So.2d 415 (Fla.1990), because it failed to consider and weigh all of the evidence relating to the establishment of mitigating circumstances, including: (1) the expert testimony pertaining to the permanent negative consequences that resulted from Card's childhood; (2) Card's poor school performance; (3) the support of Card's friends and family; (4) Card's efforts to improve himself in prison by obtaining his GED; (5) the expert testimony that Card's good behavior as a prisoner would continue if Card was given a life sentence; and (6) Card's lack of a history of committing violent crimes.
Reviewing the trial court's sentencing order, the trial court found and weighed the following mitigating circumstances: (1) Card's difficult family background (some weight); (2) Card's good prison record (slight weight); (3) Card is religious and practices Catholicism (some weight); (4) Card was abused as a child (some weight); (5) Card served in the military and had a good military record (some weight); (6) Card's artistic abilities (little weight); and (7) Card corresponded with school children to deter them from being involving in crime (some weight). Card is correct that in the trial court's sentencing order, it did not independently find and weigh the mitigating factors pertaining to Card's poor school performance and his obtaining his GED while in prison. However, having reviewed defense counsel's penalty phase closing argument and the Spencer[10] hearing, these mitigators were not proposed to the trial court as independent mitigating circumstances. Rather, defense counsel argued these mitigating factors as facts or evidence to support other mitigating circumstances.
For example, defense counsel argued that the fact that Card obtained his GED in prison was evidence that Card adjusted well to prison life. The trial court considered Card's good prison record in mitigation. Defense counsel also argued that Card did not perform well in school in conjunction with arguing that Card had a difficult childhood and family environment. The trial court found and weighed evidence of Card's family background and childhood abuse in mitigation. Moreover, contrary to Card's assertions, it is evident from the trial court's sentencing order that the trial court relied on the testimony from Dr. Haley to support the mitigating circumstances pertaining to Card's family background, childhood abuse, and good prison record.
We agree with Card that the trial court erred in failing to find and weigh evidence that Card had the support of his friends and family and his lack of a *627 history of committing violent crimes. See Burns v. State, 699 So.2d 646, 654 (Fla. 1997) (stating that the defendant's "family relationships and the support he provided his family are admissible as nonstatutory mitigation"); Brown v. State, 755 So.2d 616, 637 (Fla.2000) (trial court considered defendant's nonviolent criminal record as a nonstatutory mitigating circumstance). However, we hold that any error on the trial court's part in failing to consider these mitigating circumstances constitutes harmless error. See Singleton v. State, 783 So.2d 970, 977 (Fla.2001) (holding that trial court's error in failing to address nonstatutory mitigation was harmless because the mitigators would not outweigh the aggravation in the case); Bates v. State, 750 So.2d 6, 13 (Fla.1999) (holding trial court's failure to consider nonstatutory mitigation constituted harmless error); Wuornos v. State, 644 So.2d 1000, 1011 (Fla.1994) (same); Wickham v. State, 593 So.2d 191, 194 (Fla.1991) (same).
In the present case, the trial court found five aggravators: (1) CCP; (2) HAC; (3) avoiding or preventing a lawful arrest; (4) pecuniary gain; and (5) murder committed during the commission of a kidnapping. In mitigation, the trial court did not find any statutory mitigation but found and weighed Card's difficult family background, good prison record, his religious beliefs, childhood abuse, good military record, artistic abilities, and correspondence with school children. Having considered all the mitigating evidence in the record, including the mitigators that Card claims the trial court overlooked, we conclude that the mitigating evidence would not outweigh the strong case for aggravation. Any error in not weighing additional nonstatutory mitigating evidence could not reasonably have resulted in a lesser sentence. Accordingly, we deny Card relief on this claim.

E. VICTIM IMPACT TESTIMONY
Card contends that the State introduced impermissible victim impact testimony and argues that such testimony rendered the sentencing decision fundamentally unfair. Card challenges the testimony given by the victim's granddaughter, Courtney Brimmer, at the Spencer hearing,[11] and the testimony of the victim's husband, Ed Franklin, and daughter, Cindy Brimmer, introduced during the resentencing proceeding.[12]
Section 921.141(7), Florida Statutes (1999), allows the State to introduce "victim impact" evidence, which shows "the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death." Damren v. State, 696 So.2d 709, 713 (Fla. 1997) (quoting section 921.141(7), Florida Statutes (1993)); see Bonifay v. State, 680 So.2d 413, 419 (Fla.1996); Windom v. State, 656 So.2d 432, 438 (Fla.1995); see *628 also Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). There are certain limits to the introduction of victim impact testimony. Witnesses providing victim impact testimony are prohibited from giving characterizations and their opinions about the crime. See § 921.141(7) ("Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence."); Payne, 501 U.S. at 826-27, 111 S.Ct. 2597.
Although Courtney Brimmer's testimony exceeded the proper bounds of victim impact evidence because she commented on the defendant and the crime and provided her opinion as to a proper punishment, defense counsel failed to contemporaneously object to her testimony. Thus, this issue was not preserved for review and would not constitute fundamental error because the testimony came during the Spencer hearing and outside the presence of the jury. In addition, having reviewed the testimony of Ed Franklin and Cindy Brimmer, we conclude that neither witness provided improper victim impact testimony in violation of section 921.141(7). Accordingly, we deny relief on this claim.

F. OTHER CLAIMS
We hold the following claims are without merit: (1) in light of the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the trial court erred in denying Card's motion to require a unanimous jury verdict for the death penalty;[13] (2) the standard jury instructions that refer to the jury as advisory and that refer to the jury's verdict as a recommendation violate Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985);[14] (3) the trial court erred in not allowing Card's family members to comment on the effect that Card's execution would have on their lives;[15] (4) the CCP, HAC, avoiding arrest, pecuniary gain, and murder committed during the course of a felony aggravating circumstances are overbroad, vague, and fail to narrow the class of persons eligible for the death penalty;[16] and (5) the trial court erred in precluding Card from introducing evidence that Card had received life sentences for his crimes of robbery and kidnapping.[17]

*629 G. PROPORTIONALITY
Finally, Card challenges the proportionality of his death sentence. In deciding whether death is a proportionate penalty, the Court must consider the totality of the circumstances of the case and compare the case with other capital cases to determine if the death penalty is the appropriate penalty. See Urbin v. State, 714 So.2d 411, 416 (Fla.1998). A review of pertinent case law reveals that the death sentence constitutes an appropriate penalty in this case and is proportionate to other cases in which we have approved the imposition of the death penalty. See Zack v. State, 753 So.2d 9, 26 (Fla.2000); Knight v. State, 746 So.2d 423, 437 (Fla.1998); Gordon v. State, 704 So.2d 107, 117 (Fla. 1997); Cole v. State, 701 So.2d 845, 856 (Fla.1997); Lott v. State, 695 So.2d 1239, 1245 (Fla.1997).

IV. CONCLUSION
For the reasons discussed above, we affirm Card's sentence of death.
It is so ordered.
HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
SHAW, J., concurs in result only.
WELLS, C.J., concurs in result only with an opinion.
WELLS, C.J., concurring in result only.
I concur in result only in the decision by the majority.
I do not concur in the majority opinion for the following reasons. First, I do not agree with the opinion in respect to the prosecutor's argument. I do not join in the increasing censorship which the present majority performs on counsel's closing arguments. Second, I do not agree that the trial judge erred in respect to the finding of mitigation.
I also write to express my view that this is yet another case which should be expedited in postconviction. As in the recent case of Cook v. State, 792 So.2d 1197 (Fla. 2001), this is a case in which the murder occurred twenty years ago. This case was first reviewed by this Court seventeen years ago. Regrettably, in my view, the legal process during this long period has only been through this first step. This is a fact which we have an obligation to acknowledge and deal with as this case goes forward.
NOTES
[1] The complete procedural history of this case is as follows: This Court affirmed the convictions and sentences on direct appeal. See Card v. State, 453 So.2d 17, 18 (Fla.1984). Thereafter, Card filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 which the trial court denied. Card then filed a petition for writ of habeas corpus in this Court and sought a stay of execution. Although this Court initially granted the stay of execution, this Court subsequently affirmed the trial court's denial of the postconviction motion, dissolved the stay of execution, and denied habeas relief. See Card v. State, 497 So.2d 1169, 1177 (Fla. 1986). Card filed a second petition for extraordinary relief, writ of habeas corpus, and stay of execution, and this Court denied relief in Card v. Dugger, 512 So.2d 829, 831 (Fla. 1987). Card filed a second motion for postconviction relief, which the trial court summarily denied. See Card v. State, 652 So.2d 344, 344 (Fla.1995). In Card's subsequent appeal of the trial court's denial of his 3.850 motion, this Court reversed the summary denial of Card's claim that the trial judge improperly abdicated its sentencing responsibility to the prosecution and remanded for an evidentiary hearing on that issue alone. See id. at 345-46. After conducting an evidentiary hearing, the trial court vacated Card's death sentence. The trial court then reimposed the death sentence after a new penalty phase. This appeal followed.
[2] Doctor Edmund Kielman died before the resentencing proceedings.
[3] Card raises the following claims: (1) the State's penalty phase closing argument was fundamentally unfair; (2) the trial judge erred in not recusing herself; (3) the trial judge erred in finding and instructing the jury on four of the five aggravating circumstances; (4) the trial judge erred in failing to find proposed mitigating evidence and in failing to explain her weighing process; (5) the death penalty is disproportionate; (6) the trial court erred in denying the defense's motion to require a unanimous verdict; (7) the trial court erred in denying Card's request to give jurors an alternative instruction pertaining to CCP; (8) the trial court erred in using the standard jury instructions that refer to the jury as advisory and refers to their verdict as a recommendation; (9) the trial court erred in not allowing defense counsel to question Card's family members about the effect Card's execution would have on their lives; (10) the CCP, HAC, murder committed during the course of a felony, avoiding arrest, and pecuniary gain aggravators are unconstitutionally overbroad and vague; (11) the use of victim impact evidence violated Card's due process rights; and (12) the trial court erroneously precluded Card from introducing evidence that Card received life sentences for the robbery and kidnapping convictions.
[4] Florida Rule of Judicial Administration 2.160(f)-(g) and (i) provides for the disqualification of a trial judge, and states in pertinent part:

(f) DeterminationInitial Motion. The judge against whom an initial motion to disqualify under subdivision (d)(1) is directed shall determine only the legal sufficiency of the motion and shall not pass on the truth of the facts alleged. If the motion is legally sufficient, the judge shall immediately enter an order granting disqualification and proceed no further in the action. If any motion is legally insufficient, an order denying the motion shall immediately be entered. No other reason for denial shall be stated, and an order of denial shall not take issue with the motion.
(g) DeterminationSuccessive Motions. If a judge has been previously disqualified on motion for alleged prejudice or partiality under subdivision (d)(1), a successor judge shall not be disqualified based on a successive motion by the same party unless the successor judge rules that he or she is in fact not fair or impartial in the case. Such a successor judge may pass on the truth of the facts alleged in support of the motion.
. . . .
(i) Judge's Initiative. Nothing in this rule limits the judge's authority to enter an order of disqualification on the judge's own initiative.
(Emphasis supplied.)
[5] The order entered stated as follows:

1. That the undersigned judge is the successor judge and the predecessor judge was disqualified based on a motion filed by the defendant. As such this motion is governed by Rule 2.160 Florida Rules of Judicial Administration.
2. The Motion to Disqualify alleges that prior to becoming a circuit judge, the undersigned judge "represented Debra King with reference to a possible divorce from the defendant". The Motion does not state when this might have occurred.
3. The undersigned became a circuit judge in January of 1986.
4. The undersigned has no recollection whatsoever of ever having conferred with a Debra King in reference to a possible divorce from Mr. Card, the Defendant in this case, and has long since destroyed legal files from her private law practice.
5. Since the undersigned has no recollection whatsoever of Ms. King and of any possible consultation while she was a practicing lawyer, I do not rule that I am not fair and impartial in this case.
(Emphasis supplied.)
[6] In Urbin v. State, 714 So.2d 411, 420 (Fla. 1998), this Court condemned a similar argument that invited jurors to disregard the law "based on a reflexive fear that, regardless of the law, [the defendant] might someday be eligible for parole" and released from prison.
[7] Aggravating circumstances are limited to those specifically listed under section 921.141(5), Florida Statutes (1999). Victim impact evidence is not listed as an aggravating circumstance under section 921.141(5) that may be considered and weighed by juries. See also Kearse v. State, 770 So.2d 1119, 1133 (Fla.2000) (approving the trial court's instruction to the jury that they could not consider victim impact testimony to establish an aggravating circumstance).
[8] Reviewing essentially the same facts that the trial court heard in this resentencing, the Court affirmed the trial court's findings pertaining to CCP in Card's initial direct appeal, stating:

[T]he appellant took the victim from the Western Union office, after having cut her fingers, transported her in his car to a secluded area eight miles away, had her get out of the car, and then cut her throat. The appellate had ample time during this series of events to reflect on his actions and their attendant consequences. We find that the facts of this case demonstrate the heightened level of premeditation....
Card, 453 So.2d at 23-24.
[9] In the present case, the trial court found that the following circumstances supported a finding of CCP:

This case involved heightened premeditation in that the defendant called Vicki Elrod the morning of the murder and told her that he would be visiting her and bringing her some money later that day. He had all day to plan his attack. He wore gloves. He armed himself with a knife. He hid the knife inside his pants. After he robbed Ms. Franklin, he kidnapped her, removed her from the scene, murdered her and disposed of the only witness to the crime. He disposed of the gloves, the knife and Ms. Franklin's wallet which could have connected him to the crime and would have been evidence against him. There was more than sufficient time for the defendant to reflect on the seriousness of his acts, plan his attacks and realize what could occur if her were discovered. The evidence leaves no doubt whatsoever that the crime involved heightened premeditation and that the murder was carried out in a cold and calculated manner.
[10] Spencer v. State, 615 So.2d 688 (Fla.1993).
[11] Courtney Brimmer testified at the Spencer hearing that

for 18 years [the defendant] has had, he's been able to talk to his, you know, children and grandchildren and correspond with them and, and school children, and his life has been, for the past 18 years in prison, probably better than his first years because he's able to do artwork, and it's just, it sounds nice, really, when you ... He's had no punishment, really, I mean ... And in the Bible, one of the laws in the Bible says who so shedith man's blood by man, his blood be shed, from the image of God. So I just, I really think he's got it really easy. And I think you saw on the news when I, when I made my comment about how I would rather die in the electric chair, to where my death would be quick and easy, than to have my fingers cut off and my hair pulled back and my throat slit.
[12] Card fails to identify which portions of their testimony constituted impermissible victim impact testimony.
[13] The United States Supreme Court indicated that Apprendi does not affect capital sentencing schemes, see Apprendi, 530 U.S. at 496-97, 120 S.Ct. 2348; Mills v. State, 786 So.2d 547, 549 (Fla.2001), and this Court consistently had held that a capital jury may recommend a death sentence by a bare majority vote. See Thompson v. State, 648 So.2d 692, 698 (Fla.1994).
[14] See Brown v. State, 721 So.2d 274, 283 (Fla.1998) (holding that the standard jury instructions fully advise the jury of the importance of its role, correctly state the law, do not denigrate the role of the jury, and do not violate Caldwell).
[15] See Burns v. State, 699 So.2d 646, 654 (Fla.1997) (holding that the trial court did not err in excluding "reverse" victim impact testimony because such testimony "does not mitigate the harm caused by the crime and thus is not similarly relevant or authorized").
[16] This Court repeatedly has rejected similar constitutional challenges to the aggravating circumstances. See Blanco v. State, 706 So.2d 7, 11 (Fla.1997); Henyard v. State, 689 So.2d 239 (Fla.1996); Whitton v. State, 649 So.2d 861, 867 n. 10 (Fla.1994); Kelley v. Dugger, 597 So.2d 262, 265 (Fla.1992); Klokoc v. State, 589 So.2d 219, 222 (Fla.1991).
[17] See Marquard v. State, 641 So.2d 54, 57-58 (Fla.1994) (explaining that the sole issue before a jury in a penalty phase proceeding is what is a proper sentence for first-degree murder); see also Nixon v. State, 572 So.2d 1336, 1345 (Fla.1990) ("As to offenses in which the jury plays no role in sentencing, the jury will not be advised of the possible penalties.").