992 So.2d 810 (2008)
James Armando CARD, Sr., Appellant,
v.
STATE of Florida, Appellee.
No. SC06-1383.
Supreme Court of Florida.
July 10, 2008.
Rehearing Denied September 29, 2008.
*811 Clyde M. Taylor, Jr., Tallahassee, FL, and Baya Harrison, III, Monticello, FL, for Appellant.
Bill McCollum, Attorney General, and Stephen R. White, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
James Armando Card appeals an order denying his motion to vacate his sentence of death under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Card has raised only one issue on appeal, arguing that the trial court erroneously denied his claim that counsel provided ineffective assistance at his resentencing. For the reasons that follow, we affirm the trial court's denial.

FACTS AND PROCEDURAL HISTORY
Card was convicted of first-degree murder, robbery, and kidnapping in connection with the 1981 death of Janis Franklin and was sentenced to death. The death sentence was initially affirmed on direct appeal, but ultimately vacated by the trial court.[1] The following facts, which were also presented at the 1999 resentencing, were summarized in the Court's decision on Card's initial direct appeal:
On the afternoon of June 3, 1981, the Panama City Western Union office was robbed of approximately $1,100. Blood was found in the office and the clerk, Janis Franklin, was missing. The following day, Mrs. Franklin's body was discovered beside a dirt road in a secluded area approximately eight miles from the Western Union office. Her blouse was torn, her fingers severely cut to the point of being almost severed and her throat had been cut.
As early as 6:30 on the morning of June 3, 1981, the appellant telephoned an acquaintance, Vicky Elrod, in Pensacola, Florida, and told her that he might be coming to see her to repay the $50 or $60 he owed her. At approximately 9:30 that night Vicky Elrod met with the appellant. He took out a stack of twenty and one-hundred dollar bills and she asked if he had robbed a 7-Eleven store. He told her that he had robbed a Western Union station and killed the lady who worked there. He described scuffling with the victim, tearing her blouse and cutting her with his knife. He said he then took her in his car to a wooded area and cut her throat saying, "Die, die, die." Several days after their meeting, Vicky Elrod went to the police with this information. The appellant was then arrested.
*812 Card v. State, 453 So.2d 17, 18-19 (Fla. 1984), cert. denied, 469 U.S. 989, 105 S.Ct. 396, 83 L.Ed.2d 330 (1984).
At the resentencing, the State presented testimony establishing these same underlying facts but also presented the following evidence:
[T]he prior testimony of the medical examiner, Dr. Edmund Kielman, who had performed the autopsy of Franklin [but died before the resentencing proceeding], was read to the jury. According to Dr. Kielman's prior testimony, the victim suffered several defensive wounds and had a "very deep cut over her throat." The medical examiner stated that the wound to the victim's throat was approximately six or seven inches in length. The wound was also approximately two-and-one-half inches deep and almost went to the spinal cord. He opined that the perpetrator must have used a considerable amount of force in inflicting the wound to the victim's throat and that the instrument utilized by the perpetrator had to be fairly sharp to go that deep. The medical examiner also observed that the victim had suffered extensive wounds to her hands. The medical expert testified that these were classic defense wounds caused by the person protecting himself or herself from an attack.
In Card's defense, Card's attorney presented the testimony of several members of Card's family, including his mother, brother-in-law, ex-wife, daughter, niece, and brother. They testified about, among other things, Card's difficult childhood, his unstable family environment, his military service, and his achievements in prison. Defense counsel also presented the testimony of a Catholic priest, the director of a Catholic charity, and a Catholic sister. They testified about Card's religious beliefs, his commitment to Catholicism, his artwork, and how Card began writing to school children while in prison in an effort to deter young children from crime.
Defense counsel also presented the testimony of a professor of psychology at the University of Santa Cruz, Dr. Craig Haney, who testified about how he analyzed and evaluated Card's social history in an effort to understand or explain Card's criminal behavior. Doctor Haney opined that given Card's background, which included growing up in poverty, being abandoned by his father prior to birth, and suffering physical and emotional abuse and parental neglect, it was predictable that Card would use drugs and alcohol and engage in behavior that would lead him to prison. Doctor Haney also testified that Card had a good prison record and that, despite Card's past, he had adjusted well to prison life.
Card, 803 So.2d at 618 (footnote omitted).
The jury recommended death by a vote of eleven to one. The trial court found five aggravating circumstances,[2] which were identical to the aggravators found at the original penalty phase, no statutory mitigating circumstances, and seven nonstatutory mitigating circumstances applicable.[3] *813 After finding that the aggravators outweighed the mitigators, the trial court followed the jury's recommendation and sentenced Card to death. On direct appeal from the resentencing, we affirmed. See id. at 617-29.
Card then pursued postconviction relief in the trial court after his resentencing, filing his amended motion on April 2, 2004. Card raised nine claims for relief.[4] At the evidentiary hearing, Card presented the testimony of two witnesses to support his ineffective assistance claim.
First, Dr. Bill Mosman, a licensed psychologist and attorney in Florida, testified about the mental mitigation that could have been presented at the resentencing. Dr. Mosman did not personally meet or evaluate Card because Card refused to be examined; therefore, Dr. Mosman's testimony was based entirely on a review of Card's records, which he believed contained ample data to support two statutory mitigators, including extreme emotional and mental disturbance and Card's low intellectual age at the time of the crime, and several additional nonstatutory mitigating circumstances.
Second, Card presented his resentencing counsel, Jeffrey Whitton. Whitton testified about his preparation and investigation for the penalty phase, the experts he hired, his reasons for not presenting some of them during the resentencing, and his underlying strategy to humanize Card, who continues to vehemently deny any involvement in the crime. Whitton was appointed to handle Card's second postconviction appeal, in which he succeeded in obtaining a new penalty phase, and also represented him at the resentencing. Whitton stated that he worked with another attorney who assisted on a pro bono basis and with a mitigation investigator. Although Whitton admitted that Card was his first and only capital case, he testified that he attended a three- to four-day day seminar on capital cases during Card's representation, spent over 800 hours in preparation for the trial, and believed that he gave Card the best defense possible. After hearing testimony from the two witnesses, the trial court denied relief as to all claims in a detailed order.

*814 ANALYSIS
In his only issue on appeal, Card asserts that his resentencing counsel provided ineffective assistance at the resentencing by failing to investigate and present mitigation evidence that would have supported two statutory mitigating circumstances, including extreme mental or emotional disturbance and age.[5] Because this is a resentencing, Card's counsel had the benefit of reviewing the transcript from the first penalty phase, in which the trial court found no mitigation in sentencing Card to death. See Henry v. State, 862 So.2d 679, 686 (Fla.2003) (stating that counsel in a resentencing has the advantage of reviewing the strategy of the first penalty phase). In fact, counsel testified at the evidentiary hearing that he reviewed all of Card's records, the transcript and testimony from the first trial, and the report of the defense's former expert who testified at the 1981 penalty phase.
At the first penalty phase, the court appointed several experts to determine Card's competency to stand trial. Dr. Cartwright, a psychologist, examined Card and determined that he had a full appreciation for the charges, that he was neither insane at the time of the crime nor at the time of the trial, and that he had average intellectual ability and demonstrated antisocial personality disorder. Dr. Berland, a psychologist, met with Card and agreed that he was competent to stand trial and was not insane. The court also appointed Dr. Wray, a forensic psychiatrist, to examine Card for competency as well as to assist the defense with mental mitigation. Dr. Wray submitted several letters to the court regarding his evaluations, first concluding that Card had an IQ between 130 and 135, was not psychotic, although he may have had psychotic delusions, and that he needed further evaluation because there was a possibility of insanity. Dr. Wray's final report concluded that there was no indication of statutory mitigation, such as extreme mental or emotional disturbance at the time of the crime, no evidence of paranoid schizophrenia, and that Card essentially had antisocial personality disorder.
The defense also had hired another expert, Dr. Hord, to assist with possible mitigation. Dr. Hord, a clinical psychologist who evaluated Card on several occasions, was the only defense witness who testified at the initial penalty phase. Dr. Hord testified that Card had sociopathic personality adjustment pattern (not psychotic), he reacted poorly to stress, at the time of the murder "his mental state ... was extreme [] mental or emotional disturbance," and he had no capacity to appreciate the criminality of the conduct, but that he was both sane and rational at the time of the murder. Dr. Hord also detailed Card's poor childhood and how it created his sociopathic tendencies and testified that Card could adjust well to prison life.
At the first penalty phase, the defense presented no lay witnesses or additional testimony beyond that of Dr. Hord. The trial court, following the jury's seven-to-five death recommendation, found five aggravating circumstances applicable and, despite Dr. Hord's expert mental mitigation testimony, concluded that Card had a sociopathic personality and failed to demonstrate any mitigating circumstances. The court further noted that even if Card had established the two statutory mitigating circumstances, they would have been outweighed by the weighty aggravating circumstances. On direct appeal, this *815 Court quoted the following language from the sentencing order concerning Dr. Hord's testimony and affirmed the "reasoned judgment" of the trial court:
The Court has taken into account the testimony of Dr. Hord and finds that the defendant is apparently a sociopathic personality. It is contended that this testimony establishes that the defendant was under extreme mental or emotional disturbance at the time of the commission of the offense and that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The Court finds, however, that the testimony of Dr. Hord does not establish any particular mitigating circumstance. Even if the Court determined that each mitigating factor raised by the [d]efendant had been established, that would not outweigh the overwhelming evidence of aggravating circumstances prevalent in the testimony.
Card, 453 So.2d at 24.
In addition to the record on direct appeal, there was also a complete record in Card's initial postconviction proceeding in 1986, which contained volumes of exhibits and reports from additional psychologists concerning his mental state. For example, Card's school and juvenile court records from California and his extensive medical and psychiatric records from the military and the VA hospital were attached to his postconviction motion.
With a thorough review of the extensive record concerning Card's mental state, his background, his military experience, and his medical records, Whitton developed his mitigation strategy. Along with co-counsel, John O'Brien, Whitton hired a mitigation investigator, Pam Rogers, to assist in the resentencing. Based on a referral from Rogers, who had previously worked with him in California, an internet investigation into his credentials, and a review of an article he wrote, counsel hired Dr. Haney to assist with the mitigation investigation and presentation. Although Dr. Haney is an unlicensed psychology professor at the University of California and cannot treat or diagnose patients, he has a Ph.D. from Stanford and is a specialist in the area of psychology and legal issues. Specifically, Dr. Haney analyzes what psychological risk factors in an individual's social background and history can lead an individual to criminal behavior and indicate how well the individual will deal with incarceration. Whitton said he hired Dr. Haney "to help us with [Card's] family background and to explain to the jury how those background factors, Mr. Card's history of abuse, his school history, [and] various problems over the years" led to his current mental state and why he should be spared the death penalty. Dr. Haney visited Florida twice, once to investigate background facts and witnesses and interview Card and once to testify at the resentencing.
Counsel also hired an additional mental health expert, a clinical psychologist, Dr. McClaren, who conducted tests on Card and recommended neurological testing due to the possibility of brain damage. Counsel utilized Dr. McClaren's affidavit to seek additional neurological testing. The trial court approved the appointment of a third mental health expert, a neurologist named Dr. Elzawahry, who conducted an MRI and EEG to test for brain damage. However, counsel testified that all of the test results were normal and he never requested a PET scan because he did not believe he had sufficient supporting evidence.
Based on the results of this extensive investigation and Card's refusal to admit to the crime, counsel decided on a strategy *816 to humanize Card to the jury. Unlike the first penalty phase, where the defense presented no lay witness testimony, Whitton decided to present the testimony of nine family members and friends, who testified about their relationship with Card, his poor childhood and bizarre behavior, and his good nature. In addition, counsel decided to forgo additional expert testimony that he believed was inconclusive and inconsistent with his strategy to humanize Card. Importantly, counsel was aware that the use of a clinical psychiatrist at the first penalty phase resulted in testimony portraying Card as a sociopathic personality. Therefore, he limited his expert testimony to Dr. Haney, who studied Card's social history and background, reviewed his medical and military records, and interviewed Card and several of his family members. Dr. Haney testified about Card's background, such as poverty, instability, and abandonment, and described how those psychological risk factors tended to cause someone like Card to engage in criminal behavior and end up in prison. Dr. Haney also stated that Card has done extremely well in prison and would continue to do so if given the opportunity.
Card asserts that counsel's investigation and presentation was unreasonable because he hired an expert who was not competent to review Card's psychological and medical records and therefore failed to present testimony to support two statutory mitigators. Card's assertion that counsel was deficient in presenting the testimony of Dr. Haney is without merit for several reasons. First, although Card is correct that Dr. Haney is an unlicensed psychologist who cannot diagnose or treat, counsel's decision to hire Dr. Haney was a reasonable strategic one based on information of all available options. Counsel testified that he knew Dr. Haney was not a clinician, but specifically hired him at his mitigation investigator's suggestion because Dr. Haney was an expert in examining background, social history, and how prison life can affect individuals, both in terms of past prison experience and whether past experiences and childhood can lead to an inmate who does well in prison. Given that Card's history was well documented and he had been in prison for about nineteen years at the time of the resentencing, Dr. Haney's expertise was consistent with counsel's strategy to present testimony concerning his family background and his poor childhood and to humanize Card before the jury. The trial court's finding that Dr. Haney was competent to assist in the presentation of mitigation is supported by competent, substantial evidence.
Second, despite Card's assertions that no competent expert reviewed his records, the record confirms that Dr. Haney was not the only expert consulted during the resentencing. In fact, counsel met with several experts who had either previously evaluated Card or did so in preparation for the trial, including a clinical psychologist and a neurologist. Based on the evaluations of Dr. McClaren, the normal results of the MRI and EEG conducted by Dr. Elzawahry, and his belief that the testimony of other experts was either too inconclusive or not credible, counsel decided his best strategy was to present Card's harsh background and abusive childhood without the label of antisocial personality disorder through the testimony of Dr. Haney and Card's family. Considering that counsel's decision was based on hours of investigation and a reasonable belief that he had no credible expert who could conclusively establish mental mitigation, his decision to present the testimony of Dr. Haney was reasonable under the circumstances.
Additionally, there is competent, substantial evidence to support the trial *817 court's finding that the record did not support the presence of either extreme mental or emotional disturbance or the statutory age mitigator. As to the extreme disturbance mitigator, Dr. Mosman testified that Card had demonstrated bizarre behavior since he was young and was diagnosed as a schizophrenic personality between the ages of thirteen and sixteen, his military records show psychiatric evaluations, and Minnesota Multiphasic Personality Inventory ("MMPI") tests performed in 1981 and again in 1987 were consistent with schizophrenic type personality disorder. He also stated that Card's records, including the evaluations of two experts from the resentencing, indicated he had had head injuries and possible brain damage and that his IQ scores ranged from 83 in 1959, to 78 in 1961, to 96 in 1987.
However, as noted by the trial court, there was ample contradictory evidence in the record from experts who evaluated Card that he did not suffer from schizophrenia, but rather had antisocial personality disorder, and that the most recent test results confirmed that he had no brain damage. For example, Dr. Cartwright evaluated Card for competency to stand trial in 1981 and indicated that he was of average intelligence and demonstrated antisocial personality disorder. Dr. Wray also evaluated Card for competency and concluded that he had antisocial personality disorder and that there was no evidence of schizophrenia or extreme mental or emotional disturbance at the time of the crime. Although Dr. Mosman relied upon a 1986 report by Dr. Smith, which concluded that Card's symptoms were consistent with schizophrenia and recommended additional testing to rule out brain damage, that report was specifically generated to attack the competency investigation at the first penalty phase and was inconsistent with other tests indicating that Card had antisocial personality disorder. Further, even Dr. Mosman admitted that the results of the most recent MRI and EEG conducted in 1999 were normal. Thus, there was sufficient evidence in the record to contradict Dr. Mosman's testimony that Card suffers from schizophrenia and has organic brain damage. Counsel is not rendered deficient for failing to present such testimony at the resentencing.
As to the statutory age mitigator, Card attacks Whitton for failing to understand the age mitigator and that emotional immaturity is a relevant factor to be considered. In this case, Card was thirty-four at the time of the murder, had received his GED degree and completed three and a half years of college, was at least of average intelligence (although he had received IQ scores as high as 130 to 135), and had taken care of his younger siblings and their children during his life. Therefore, the statutory age mitigator was clearly not applicable to Card and counsel cannot be deficient for failing to present evidence as to Card's alleged mental age. See Troy v. State, 948 So.2d 635, 652 (Fla.2006) (finding no abuse of discretion where trial court denied an instruction on the statutory age mitigator when the defendant was thirty-one at the time of the crimes and there was evidence that he worked, cared for his daughter, and functioned as a mature adult).
Essentially, Card's claim is that his counsel should have hired different experts and presented additional evidence.[6] *818 Notably, Card has not uncovered any additional mitigation witnesses or background records he asserts counsel should have discovered.[7] This Court has repeatedly held that counsel's entire investigation and presentation will not be rendered deficient simply because a defendant has now found a more favorable expert. See, e.g., Peede v. State, 955 So.2d 480, 494 (Fla.2007). Counsel was faced with an inconclusive record on mitigation, so he fully investigated the records, hired several experts to assist in investigating mitigation, sought additional testing when recommended by the experts, and decided to forgo the presentation of certain expert testimony that he believed was inconclusive, not credible, or would make Card look like a "crazed killer" before the jury. Counsel's strategy was reasonable under the circumstances and certainly cannot be deemed constitutionally deficient as that term has been explained by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and its progeny, and consistently reiterated by this Court. See, e.g., Occhicone v. State, 768 So.2d 1037, 1048 (Fla. 2000). Accordingly, we conclude that counsel conducted a reasonable investigation and made a reasonable strategic decision as to how to present the case for mitigation.[8]

CONCLUSION
For all of these reasons, we affirm the trial court's denial of Card's motion for postconviction relief.
It is so ordered.
QUINCE, C.J., and WELLS, ANSTEAD, PARIENTE, LEWIS, CANTERO, and BELL, JJ., concur.
NOTES
[1] Card's first postconviction motion was denied by the trial court and affirmed on appeal. Card's second postconviction motion was summarily denied by the trial court, but this Court remanded the case for a hearing on Card's claim that the trial judge improperly abdicated its sentencing responsibility to the prosecution. Upon remand, "the trial court vacated his sentence of death after an evidentiary hearing based on an improper procedure used in permitting the State to prepare the original sentencing order." Card v. State, 803 So.2d 613, 617 (Fla.2001). Our decision on direct appeal from resentencing details the procedural history of this case. See id. at 617 n. 1.
[2] The trial court found the following five aggravators: (1) the murder was committed during the commission of a felony (kidnapping); (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest; (3) the murder was committed for pecuniary gain; (4) the murder was especially heinous, atrocious, or cruel ("HAC"); and (5) the murder was committed in a cold, calculated, and premeditated manner ("CCP"). Id. at 618.
[3] The trial court found the following seven nonstatutory mitigators:

(1) Card's upbringing was "harsh and brutal" and his family background included an abusive stepfather (some weight); (2) Card has a good prison record (slight weight); (3) Card is a practicing Catholic and made efforts for other inmates to obtain religious services (some weight); (4) Card was abused as a child (some weight); (5) Card served in the Army National Guard and received an honorable discharge (some weight); (6) Card has artistic ability (little weight); and (7) Card has corresponded with school children to deter them from being involved in crime (some weight).
Id. at 618-19.
[4] Card raised the following claims: (1) the death sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); (2) under Ring and Apprendi, Card is entitled to a new penalty phase with the same jury that convicted him of first-degree murder in 1981; (3) penalty-phase counsel was ineffective in failing to object to improper comments during the State's closing argument; (4) penalty-phase counsel was ineffective in failing to argue that evidence supported both statutory and nonstatutory mitigators; (5) penalty-phase counsel was ineffective in recommending that Card not testify; (6) penalty-phase counsel was ineffective in failing to request DNA testing or raise a claim of actual innocence; (7) penalty-phase counsel was ineffective in failing to investigate the victim's family's position on the death penalty; (8) newly discovered evidence concerning the autopsy of the victim would probably produce an acquittal on retrial; and (9) penalty-phase counsel was ineffective in failing to investigate and present mitigation evidence. The trial court held a hearing pursuant to Huff v. State, 622 So.2d 982 (Fla. 1993), on December 14, 2005, and granted an evidentiary hearing on claims (5) and (9).
[5] Card also filed a notice of appeal concerning the trial court's denial of his motion for DNA testing. However, he failed to raise the issue in his brief and conceded at oral argument that he was abandoning the issue at this time. Accordingly, we do not address it.
[6] To the extent Card alleges that counsel was deficient because this was his first capital case and he lacked understanding of the statutory system, that claim is unsupported by the record and counsel's testimony as to his extensive preparation for the resentencing. Counsel also represented Card in his postconviction motion that successfully obtained a new penalty phase. Although counsel stated that the age mitigator is confusing, that does not render his entire performance deficient, especially where the statutory age mitigator was not supported by the record.
[7] At the evidentiary hearing, Dr. Mosman testified that additional psychiatric records concerning two inpatient psychiatric hospitalizations for alleged self-inflicted wounds could have been obtained through proper research. However, Card did not argue in his brief on appeal that counsel was ineffective for failing to uncover these records or that such records were not accessible to counsel or the experts he consulted during the resentencing. In addition, even if counsel failed to locate these two hospital records, general information concerning these hospitalizations was found in other medical records contained in the record.
[8] Because we have concluded that counsel was not deficient, we do not address the prejudice prong of Strickland. See Reaves v. State, 942 So.2d 874, 881 (Fla.2006).