# Supreme Court of Florida

_____

No. SC13-1076
_____

**PINKNEY CARTER,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[July 2, 2015]

PER CURIAM.

Pinkney Carter appeals from an order denying a motion to vacate three judgments of conviction of first-degree murder and two sentences of death under Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from capital convictions for which sentences of death were imposed, this Court has jurisdiction of the appeal under article V, section 3(b)(1), Florida Constitution. For the reasons that follow, we affirm the order of the circuit court denying postconviction relief.

**FACTS AND PROCEDURAL HISTORY**

Pinkney Carter appeals the order of the circuit court of the Fourth Judicial Circuit in and for Duval County denying his amended motion for postconviction relief in which he challenged his convictions and sentences for the 2002 first-degree murders of Elizabeth Reed, her daughter Courtney Smith, and Glenn Pafford, whom Reed had been dating. In his postconviction motion, Carter raised a number of claims, including claims of ineffective assistance of trial counsel.[1] The facts surrounding his convictions and sentences for the three first-degree murders are set forth in this Court's direct appeal opinion as follows:

> Carter and Elizabeth Reed dated on and off for approximately four years, during which time Carter periodically lived with Reed and

---

1. The amended postconviction motion alleged the following claims: (1) a violation under U.S. v. Cronic, 466 U.S. 648 (1984), occurred when defense counsel admitted at voir dire that Carter killed the three victims, assumed a false name, and fled the country; (2) trial counsel was ineffective in failing to adequately prevent the State from seeking the death penalty; (3) trial counsel was ineffective in failing to move for a change of venue; (4) trial counsel was ineffective in failing to object to numerous improper comments by the prosecutor during the guilt and penalty phases of trial; (5) trial counsel was ineffective in failing to challenge seven of the potential jurors who sat on the jury for cause or by peremptory challenge despite knowledge that the jurors had been exposed to outside information about the case; (6) the trial was fraught with procedural and substantive errors which were not harmless; (7) Florida's capital sentencing statute is unconstitutional on its face and as applied in failing to prevent arbitrary and capricious imposition of the death penalty and, to the extent this issue was not properly litigated at trial, Carter received ineffective assistance; (8) the law enacting lethal injection is unconstitutional and violates the prohibition against ex post facto laws; and (9) trial counsel was ineffective for failing to properly utilize its chosen mental health experts and argue for two statutory mitigators.

her four children. During the course of their relationship, Carter helped Reed purchase a house on Barkwood Drive in Jacksonville and assisted her financially when she fell behind on her mortgage payments. At one point in early 2002, Carter proposed marriage, and Reed accepted. However, the engagement was soon called off and Carter moved out. Yet, according to Carter, he and Reed continued to date and were intimate.

By the summer of 2002, Carter learned that Reed had been seeing Glenn Pafford, who managed the Publix Supermarket where she worked. Around this time, neighbors spotted Carter lurking suspiciously near Reed's home and noticed his red Dodge pickup truck in the neighborhood.

On Sunday, July 21, 2002, Reed visited Carter's apartment, where he was staying with his mother and his brother. Carter testified that Reed gave him some of her prescription pills for depression, and the two made plans to meet on Tuesday night. When Reed did not show up, Carter drove by her house and saw Pafford's truck in her driveway. From there, Carter drove home and spent several hours thinking about his relationship with Reed. He took three of the antidepressant pills Reed had given him and drank four to five glasses of whiskey. Around 11:30 p.m., Carter telephoned Reed. Her fourteen-year-old son Richard answered and told Carter that Reed was not home.

In the predawn hours of the following day, Carter returned to Reed's home. He parked in her front yard, retrieved his loaded .22 caliber rifle from the back seat of his truck, and began walking toward the house. As Carter approached Reed's home, Pafford walked out and Reed stood in the doorway. Concealing his rifle at his side, Carter confronted the couple and asked why Reed was still seeing him if she was seeing Pafford. Pafford asked Reed if she was still seeing Carter, and Reed responded that she was not. Pafford then asked Reed if she wanted him to stay, but Reed said that she wanted both men to leave. Carter responded that he was not leaving until he got some answers. According to Carter, Reed opened the door wider, and the three entered and stood in Reed's living room.

Once inside, Carter yelled at Reed, "I can't believe you're going to lie straight to the man's face like that." Then, according to Carter, Reed noticed the gun concealed at his side and grabbed for it. Reed began struggling with Carter in an attempt to take the gun away from him. Carter's finger was on the trigger and Reed had both hands

on the barrel. Hearing the commotion, Reed's eldest daughter, Courtney Smith, ran into the living room, saw the gun, and then ran back toward her room. At that moment, according to Carter, the gun discharged, shooting Smith once in the head. Carter testified that Reed immediately let go of the gun and screamed, "Oh my God, dial 911!" As Reed ran toward her daughter, Carter aimed and shot Reed twice in the head. Immediately thereafter, Carter turned toward Pafford, aimed, and shot him three times in the head. Carter then fled the premises. The noise of the gunshots woke Richard, who came from his bedroom to find Pafford and Reed dead and Smith critically injured. Smith later died from her injuries. Reed's two other children, Rebecca and Brian, ages eight and six respectively, were also home at the time of the shooting.

Following the murders, Carter drove to his brother's house where he wrote notes to his mother and his sister. He then drove to Valdosta, Georgia, stole a Georgia state license plate from his friend's vehicle and placed it on his red Dodge pickup truck. From there, Carter drove to Starr County, Texas, where he abandoned his truck on the bank of the Rio Grande and swam across, entering Mexico illegally. While swimming, Carter abandoned his rifle, which was later recovered by the Mission County, Texas, Fire Rescue dive team. Upon entering Mexico, Carter was detained by the Mexican Military Police but was later released. Carter then traveled to Central America before returning to the United States to find work. He worked in both Illinois and Kentucky under the aliases Chris Cruse and Rodney Vonthun. Then, on January 6, 2004, while working in Kentucky as a roofer, Carter was identified by the Kentucky State Police and arrested for the murders of Pafford, Reed, and Smith.

Carter v. State, 980 So. 2d 473, 477-78 (Fla. 2008) (footnote omitted).

At the conclusion of the penalty phase of the 2005 jury trial in which Carter was convicted of all three murders, the jury recommended a sentence of death for the murder of Pafford by a vote of nine to three, a sentence of death for the murder of Reed by a vote of eight to four, and a sentence of life imprisonment for the

murder of Smith. After a <u>Spencer</u> hearing,[2] the trial judge followed the sentencing recommendations and, as to each of the two sentences of death, found three statutory aggravators, giving great weight to each: (1) prior capital convictions for the contemporaneous murders (§ 921.141(5)(b), Fla. Stat. (2005)); (2) that the murders were committed during a burglary as specifically found by the jury (§ 921.141(5)(d), Fla. Stat. (2005)); and (3) that the murders were committed in a cold, calculated, and premeditated (CCP) manner (§ 921.141(5)(i), Fla. Stat. (2005)). No statutory mitigators were offered or found, but seventeen nonstatutory mitigators were found, including but not limited to the fact that Carter came from a broken and sometimes impoverished home, was abandoned by his abusive father and ignored by his stepfather, achieved success in high school and college, exhibited leadership at college, had a distinguished service record in the military, was a good employee with a good work record, had good family relations, was a loyal friend, and he offered to plead guilty in exchange for life sentences.

On direct appeal, Carter raised a number of claims. He challenged the constitutionality of section 775.051, Florida Statutes (2002), which provides that voluntary intoxication is not a defense to any offense and is not admissible to show

---

2. <u>Spencer v. State</u>, 615 So. 2d 688, 690-91 (Fla. 1993) (providing for a hearing after trial, before the judge, at which the parties may present any additional information or evidence pertinent to the appropriate sentence to be imposed and to afford the defendant an opportunity to be heard in person).

lack of specific intent, but the claim was found to be meritless.  Carter, 980 So. 2d at 479-80.  We also found that the evidence was sufficient to support the convictions.  Id. at 480.  As to penalty phase claims, Carter claimed on direct appeal that the Court should vacate his death sentences for the murders of Pafford and Reed because: "(1) the trial court erred in finding the burglary and CCP aggravators; (2) the trial court erred in giving great weight to the burglary and prior violent felony aggravators; (3) the trial court erred in issuing a sentencing order that lacks clarity; (4) the trial court erred in refusing to require the State to follow the promise it made to the government of Mexico that it would not seek a death sentence if Carter were released into the State's custody; (5) Carter's death sentence is illegal under Ring v. Arizona, 536 U.S. 584, 609 (2002); and (6) the trial court erred in giving standard jury instructions which diminished the jury's sense of responsibility for sentencing." Id. at 480.  We found each of these claims to lack merit.  Finally, we found the two death sentences to be proportional, and we affirmed the convictions and sentences.  Id. at 485-87.

Carter filed his initial postconviction motion in 2009, which was subsequently amended.  After case management hearings held March 18, 2010, and October 14, 2011, the circuit court, Judge Lance Day presiding, held an evidentiary hearing on five of the claims on August 1, 2012, and September 24, 2012.  Postconviction relief was denied on March 28, 2013, and this appeal ensued.

Carter now raises two claims. He first contends that his trial counsel was ineffective in failing to call a mental health expert during the penalty phase of trial or in the subsequent Spencer hearing to establish two statutory mitigators and to disprove one statutory aggravator. He also contends that trial counsel was ineffective in failing to move for a change of venue. We turn first to the claim that trial counsel was ineffective in failing to call experts to testify as to mental health mitigation at trial or at the Spencer hearing.

**ANALYSIS**

Ineffective assistance of counsel claims present mixed questions of law and fact. Thus, we employ a mixed standard of review in which we defer to the circuit court's findings of fact that are supported by competent, substantial evidence, and we review that court's application of law to those facts de novo. See, e.g., Franklin v. State, 137 So. 3d 969, 980 (Fla. 2014). Under the Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), to prove a claim of ineffective assistance of counsel, the defendant must show that counsel's assistance was so defective as to require reversal. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." Id. at 687. The defendant must show that

"counsel's errors were so serious as to deprive the defendant of a fair trial," which the Supreme Court defined as "a trial whose result is reliable." Id. Without both showings, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. In demonstrating prejudice necessary to meet the second prong of Strickland, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

In making such an inquiry, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689. Significantly,

> [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). The Supreme Court in Strickland recognized that "[m]ore specific guidelines are not appropriate," and that the proper measure of attorney performance "remains simply reasonableness." Id. at 688. "When a defendant challenges a death sentence such

- 8 -

as the one[s] at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. "To assess that probability, [the Court] consider[s] 'the totality of the available mitigation evidence . . .' and 'reweigh[s] it against the evidence in aggravation.' " Porter v. McCollum, 558 U.S. 30, 41 (2009) (quoting Williams v. Taylor, 529 U.S. 362, 397-98 (2000)). Because both deficient performance and prejudice must be shown to establish ineffective assistance of counsel, a reviewing court is not required to rule on one prong of the test when it is apparent that the other element is not satisfied. See Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986).

### Mental Health Mitigation

Within this framework, we turn to Carter's claim that trial counsel should have presented mental health experts to testify about Carter's psychological "risk and protective factors" that he contends would have supported the statutory mitigators that the murders were committed while Carter was under the influence of extreme mental or emotional disturbance[3] and that his capacity to appreciate the

---

3. Section 921.141(6)(b), Fla. Stat. (2005).

criminality of his conduct or conform his conduct to requirements of law was substantially impaired.[4]  Carter also contends that an expert could have disproved the statutory aggravator that the murder was cold, calculated, and premeditated.[5]

In support of this argument in the postconviction proceeding, Carter presented the testimony of Dr. Francisco Gomez, a forensic clinical and neuropsychologist who evaluated Carter and submitted a report as to his conclusions.  Dr. Gomez testified at the evidentiary hearing about Carter's "risk and protective factors" that affect an individual's behavior later in life.  He explained that the research into the effect of these risk and protective factors was conducted in relation to a study by the United States Department of Justice assessing risk factors for juvenile violence, as well as protective factors in a juvenile's life.  He agreed that Carter was not a juvenile, being in his mid-forties when he committed these crimes, and that Carter had an average IQ and attended college, both of which tend to negate the effect of the risk factors.  Dr. Gomez opined, however, that the study was still relevant to assess the risk factors in Carter's life, in spite of his higher education and older age.

---

4.  Section 921.141(6)(f), Fla. Stat. (2005).

5.  Section 921.141(5)(i), Fla. Stat. (2005).

Dr. Gomez concluded that Carter's life history showed he had significant risk factors for mental health problems, alcohol abuse, and violence. Dr. Gomez testified that he found risk factors in Carter's life, including childhood maltreatment, poor family management, lack of structure and discipline, and low levels of parental involvement. He testified that Carter was affected by his father's neglect and then abandonment, and by his mother's depression, which caused her to be less emotionally connected. Dr. Gomez reported that Carter developed significant pathology around being abandoned. Dr. Gomez also noted Carter's exposure to domestic violence, family mental illness, and family dysfunction. Carter experienced family instability as a child and lacked any close male figures in his life. The family moved often after Carter's parents' divorce, and their economic situation was poor. His mother remarried, but Carter's stepfather was an alcoholic and verbally abusive.

Dr. Gomez also identified some protective factors in Carter's life and background. These included Carter's average intelligence, his lack of any psychopathy, and the facts that he did not lack empathy, that he attended school, that people liked him, that he did not have a long antisocial history of fighting or breaking the law, and that he was not extremely irresponsible. Dr. Gomez noted that Carter served in the United States Air Force after high school and then attended college—one year at Western Oklahoma State College and three years at

the Oklahoma State University. However, Dr. Gomez was unaware of the full extent of Carter's past history of violence.

Dr. Gomez's report concluded that Carter had a cognitive disorder not otherwise specified (hyperactivity and impairments in executive functioning, memory, inhibiting impulses, and organizing behavior) and borderline personality disorder (impulsivity, strong emotional reactions to fear of abandonment, and dramatic behavior). Dr. Gomez opined that Carter's criminal behavior was a result of the combination of his risk and protective factors and that when the protective factors broke down and Carter was placed in stressful situations, he would be capable of criminal action as occurred in this case. After all the testing was complete, Dr. Gomez concluded that Carter "may become overwhelmed in situations that are emotionally charged and will tend to react impulsively." Dr. Gomez also concluded that "under duress [Carter] may be prone to act out aggressively" without thinking the situation through, and that because of Carter's strong fear of abandonment, he will act in a dramatic and impulsive manner to avoid losing a loved one. Based on his evaluation of Carter and his consideration of the risk and protective factors in Carter's history, Dr. Gomez opined that Carter met the requirements for two statutory mental mitigators—that the defendant was under the influence of extreme mental or emotional disturbance and the

defendant's capacity to appreciate the criminality of his conduct or to conform it to the requirements of law was substantially impaired.

Dr. Gomez agreed in his testimony that all the risk and protective factors were contained in the information reviewed before trial by Drs. Krop and Miller, two of the three experts retained by trial counsel but not presented in the penalty phase. Dr. Gomez testified that the trial experts "did what I did and what a normal psychologist does or a forensic psychologist. They took . . . his family's history, his mental health history, his social history, his education history, his schooling history." The circuit court denied relief on this claim, finding that although the experts retained by trial counsel were not presented at trial, the substance of the risk and protective factors discussed by Dr. Gomez was contained in the lay witnesses' testimony in the penalty phase, in which the mitigation witnesses testified about Carter's unstable family life, his childhood, education, and work history. We agree.

For instance, Carter's brother Clifton Michael Carter testified at the penalty phase that their father was often absent and, when home, was violent toward their mother. Their mother was subservient, did not drive, did not work outside the home, and was totally dependent on their father. He said that all the family members were afraid of their father, although he never saw their father abuse Carter. Their father left and never returned when Carter was about ten years old.

Michael Carter testified that the family moved around a lot and their mother eventually remarried.

Carter's sister Cynthia Starling testified that when Carter had a broken arm, she witnessed their father become angry about it and violently throw Carter on the bed. After their father left, the family's life was difficult without his financial support, and her brothers held part-time jobs to help support the family. While in high school, Carter worked in a pool hall, a grocery store, and in the school cafeteria. When their father remarried a woman named Lura Lee, who owned citrus groves and a summer horse camp for children, the siblings went to visit them a number of times during summers and helped run the camp. Starling testified that their father continued to be cold and distant from them. One of Lee's children, Jo Larkin, testified that when Carter's father married her mother and moved to the ranch, he was a "destructive individual" who was violent and mean to the family. She said he was verbally and physically abusive to Lee and to some of the children, and was cruel to some of the horses on the ranch. She said his actions and cruelty to the family had a lasting negative effect on the children, and she and one of her sisters required therapy because of Carter's father.

Carter's sister Cynthia also testified during the penalty phase that there came a time when their mother took an overdose of pills and had to be hospitalized in a mental health facility in 1970 when Carter was in high school. Their mother

continued to be depressed but remarried when Carter was in high school. After that, their mother was able to drive and hold a job, although the children continued to worry about her mental state and would check her medications frequently. Cynthia testified that they were better off financially after the remarriage, but their stepfather was an alcoholic who was abusive when intoxicated, and was a racist. She also testified that Carter was a loving brother who was close to her and her sons.

Farrell Clay, Carter's uncle, testified at the penalty phase that Carter's father was frequently absent and did not support the family financially, causing them to have great financial hardship. He also testified about Carter's mother's depression, her gentle manner, and her dependent, subservient relationship with Carter's father. Carter's aunt Georgia Coggins gave similar testimony, and testified about Carter's mother's depression and treatment. Gussie Clay, a relative by marriage to Carter's mother, testified about the poor financial condition of Carter's family after the father abandoned them. She later helped Carter's mother get a job at a mill where she worked until retirement.

Brenda Barron, a teacher from Carter's high school, testified that Carter was a respectful student who was involved in sports and other school activities such as science club, letter club, drama, and football homecoming court. She said he was very popular with the other students. Ronald Lowe, the football coach from

Carter's high school, testified that Carter was a lifeguard one summer at the Lions Club swimming pool that Lowe managed. He testified that Carter saved the life of a young child that summer. John Thornton testified that Carter worked for him in a supermarket while attending Western Oklahoma State College, which was described as a community college. He said Carter was a good employee, well-liked, reliable, energetic, and trustworthy. They were close in age, and played sports and dove hunted together outside of work. John Bayless and Mel Wright, who both taught Health and Physical Education at Oklahoma State University, testified about Carter's generally good college grades, and the fact that Carter was elected president of the "Majors Club," which was an important club for health and physical education majors. Carter also helped with the Special Olympics.

These witnesses were only a small fraction of the twenty-seven mitigation witnesses presented by trial counsel, which included employers who testified about Carter's good employment characteristics, jail personnel who testified he was a good inmate,[6] and jail inmates who gave favorable evidence about Carter. It can be seen, as the postconviction court found, that this penalty-phase testimony gave the jury factual information concerning what Dr. Gomez characterized as the

---

6. Trial counsel also presented Michelle Fletcher, a pretrial detention facility corrections officer, at the Spencer hearing to testify to Carter's behavior in jail, and how he counseled other inmates and got along well with jail personnel.

- 16 -

various risk and protective factors that affected Carter's life growing up and into young adulthood. Carter contends, however, that trial counsel should have presented a mental health expert to connect all these factors and explain how they may have led to Carter's condition at age forty-seven when he shot and killed Reed, Pafford, and Reed's daughter, Smith.

Carter contends that the expert testimony would have supported the statutory mental health mitigators and would have placed his nonstatutory mitigation in a proper framework to be better understood by the jury, resulting in less severe sentences. However, the United States Supreme Court has rejected a similar argument that the prejudice prong was met where counsel failed to present an expert witness to "make connections between the various themes in the mitigation case and explain to the jury how they could have contributed to [the defendant's] involvement in criminal activity." Wong v. Belmontes, 558 U.S. 15, 23 (2009) (quoting Belmontes v. Ayers, 529 F.3d 834, 853 (9th Cir. 2008)). The Supreme Court reasoned that such evidence was not complex or technical and required only that the jury make logical connections of the kind a layperson is well equipped to make. Belmontes, 558 U.S. at 24. The Supreme Court also noted, "What is more, expert testimony discussing Belmontes' mental state, seeking to explain his behavior, or putting it in some favorable context would have exposed Belmontes to

the [negative] evidence" of past suspected crimes.  <u>Id.</u> at 24.  These same

conclusions apply in this case.

In addition, in the present case, the risk and protective factors testimony of

the type given by Dr. Gomez was derived from a study of factors predictive of

juvenile violence.  And, Dr. Gomez conceded, if a person has an average IQ, gets

older, and goes to college, there is less correlation between the early risk factors

and later violence.  Carter was in his mid-forties when this crime occurred, has an

average IQ, attended college where he did well, and held a number of responsible

jobs.  Carter also contends Dr. Gomez's testimony was critical because it explained

why Carter flew into a rage and impulsively shot three people.  However, in Dr.

Gomez's testimony and in his report, he characterizes Carter's actions as aberrant.

Under that definition, further explanation and attempts to connect early risk and

protective factors to Carter's actions years later in the multiple murders would

have little predictive value because aberrant behavior is by nature unpredictable

behavior.  For this reason alone, the mitigation evidence proposed by Dr. Gomez

was not substantial or compelling.  Moreover, if expert testimony such as that

presented by Dr. Gomez were admitted, it would open the door to several

extremely violent past actions committed by Carter.  As the court below found,

> when separated from his ex-wife, Defendant donned a mask, went to
> her home, held her at knifepoint, and threatened to kill her.  Another
> incident of domestic violence in Illinois led to anger management
> courses.  Additionally, there was an allegation that when Defendant

was employed by a carnival he was involved in an aggravated assault. Defense counsel determined that it was necessary to prevent this information from being brought out during the guilt or penalty phase. . . . Defendant agreed with counsel's penalty phase strategy.

The Eleventh Circuit has reiterated that "it is reasonable to conclude that a defendant was not prejudiced when his mitigation evidence 'was a two-edged sword or would have opened the door to damaging evidence.' " Evans v. Sec'y, Dept of Corr., 703 F.3d 1316, 1327 (11th Cir.) (quoting Ponticelli v. Sec'y, Fla. Dep't of Corr., 690 F.3d 1271, 1296 (11th Cir. 2012)), cert. denied 133 S. Ct. 2742 (2013). The expert mitigation proposed by postconviction counsel and rejected by trial counsel was just such a "two-edged sword."

This case does not present the situation where counsel completely failed to investigate mental health mitigation. Cf. Hurst v. State, 18 So. 3d 975, 1015 (Fla. 2009) (new penalty phase granted where trial counsel failed to investigate mental mitigation in spite of evidence that such examination was indicated, and where there was no countervailing "double-edged sword"). Trial counsel in Carter's case did retain mental health experts and had full evaluations performed on Carter in order to discover any meaningful mental health mitigation. Counsel retained Dr. Harry Krop, a psychologist, who performed extensive testing[7] and evaluation

---

7. The following tests were conducted: Wechsler Memory Scale III Abbreviated; Wechsler Abbreviated Scale of Intelligence; Aphasia Screening Evaluation; Bender-Gestalt Recall, Finger Tapping Test, Trail Making Test; Booklet Categories Test; Wisconsin Card Sort; and the Test of Memory

of Carter prior to trial. At the evidentiary hearing, trial counsel characterized Dr. Krop as a very qualified and experienced expert who has testified numerous times in death penalty cases. Dr. Krop compiled historical information about Carter and his family, and was given information on Carter that contained all the facts that Dr. Gomez called "risk factors." Defense counsel also retained another mental health expert, Dr. Miller, to further evaluate Carter for possible mental health mitigation, and neurologist David P. McCraney, who arranged for an MRI examination and a PET scan to be conducted on Carter.

Trial counsel Alan Chipperfield testified that the defense did not present Dr. Krop at trial because his conclusion was not helpful and would have subjected Carter to an evaluation by the State's experts, resulting in the likely disclosure of the violent incident with Carter's former wife and other past incidents of violence. Chipperfield testified that he had been as thorough as he could be in investigating possible mental health mitigation, and that the defense strategy in the penalty phase was to present Carter as "a good guy" who acted out of character on the day of the murders, and to prevent harmful information about him from coming before the jury. He did not recall that the defense experts provided any helpful mitigation

---

Malingering. Dr. Krop noted a deficit in working memory, a mild deficit in perceptual motor functioning, and mild deficits in areas associated with the frontal lobe. For these reasons, the MRI and PET scan were performed.

information, and counsel decided that whatever benefits would be gained from the experts' testimony would be outweighed by opening the door to harmful past incidents. Chipperfield explained that in every penalty phase case, counsel must balance the good and the bad to maximize the best mitigating evidence, which is what they were trying to do when they decided not to present Dr. Krop or another mental health expert at trial.

As to the statutory mitigators of extreme mental or emotional disturbance and substantial impairment of Carter's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law, Chipperfield testified that the defense did not have an expert who would have provided evidence meeting those statutory mitigators. Thus, counsel decided to present a humanizing defense, showing Carter to be a good person deserving of life in prison. Chipperfield explained that Carter was the only defendant he had represented who had worked every quarter of every year since he was old enough to work, had gone to college, and served in the Air Force. Carter "had all kinds of good things in his background that we were able to present and that together with the fact that the crime was obviously an emotional thing for him. He was in love with this woman and they had raised children together . . . . Although they weren't his children he had loved those children just as if they were his own."

Postconviction counsel also presented the testimony of trial cocounsel William White. He testified at the evidentiary hearing that the defense goal was to present a "good guy" from a "bad background" defense in the penalty phase. He said information that was discovered and presented included Carter's childhood, social background, educational background, family history, work history, and family relationships. White testified that when Carter's father abandoned the family, the mother was depressed and in dire financial straits. However, Carter later went to college and did fairly well there, and he had a very positive work history. White testified that on the day of the murder, Carter reported that he had taken several pills, presumably Prozac, given to him by the victim Reed. White said that, according to Carter, he had not slept for thirty-six hours prior to the murders. Therefore, White and his cocounsel researched the side effects of Prozac, contacting experts both inside and outside the United States to discover any helpful mitigation, but nothing helpful was discovered. White also confirmed there were some events in Carter's past that could prove harmful if revealed, including prior arrests and prior criminal acts.

White explained that close to thirty witnesses were called in the penalty phase and Spencer hearing. Prior to trial, people from Oklahoma State University were interviewed and depositions were conducted in Georgia, Oklahoma, Kansas, and, he said, possibly Oregon. He obtained records from Carter's time at

Oklahoma State University and obtained some of his medical records. As to counsels' planning regarding evidence for possible statutory mitigators, White testified:

> The discussions with our experts didn't lead us to believe that we would get strong testimony in support of those and in addition the factors that we discussed earlier in this testimony today about prior incidents we were fairly certain that if we had presented those mitigating circumstances those prior factors would have come to the fore.

When asked why he did not present any evidence of statutory mitigators at the Spencer hearing, White testified there was concern that if the defense had presented that evidence, and if the prior harmful incidents in Carter's past had been disclosed, it might have influenced the judge in a negative way and resulted in the judge not finding the mitigation that he ultimately did find in the sentencing order.

White conceded that the strategy he and Chipperfield developed was not successful and noted "the temptation is to look back and say should I have done something else." However, White testified that his strategy was to avoid bringing out the negative aspects of Carter's life. When White was asked if it would have been beneficial to have an expert put the good and bad aspects of Carter's life into a framework that would explain why the bad things occurred, he replied that that would have been "a strategy that conflicted with the strategy we took," and "whether we were right or wrong or whether we did the right thing or not it was a strategy that conflicted with the strategy we took because to do that we would

have, we felt, opened the door" to incidents which were very negative. White testified that he and Chipperfield "spent quite a bit of time" with Carter talking about the penalty phase and the witnesses to present. He testified that it was his recollection that Carter agreed with the strategy they formulated.

The circuit court correctly found that trial counsel "conducted a thorough investigation for mitigation in this case and made a reasonable strategic decision to forgo expert testimony during the penalty phase and instead present nearly thirty lay witnesses who highlighted Defendant's strengths and portrayed him as a 'good guy,' and explained his hardships." The circuit court also correctly found that inclusion of expert testimony would have opened the door for rebuttal evidence regarding negative events in Carter's past. We agree that the evidence presented by trial counsel White and Chipperfield at the penalty phase, and their testimony at the evidentiary hearing, demonstrated that they conducted a thorough mitigation investigation, including extensive family background information, school records, employment records, Air Force records, and good jail behavior. Importantly, they retained three mental health experts to test and evaluate Carter, but based on the information counsel received from the experts after evaluation and testing, both trial counsel agreed that the experts would not provide any helpful mitigation, but would open the door to the highly negative violent incidents in Carter's past.

We have repeatedly held that a strategy of humanizing the defendant, and presenting him as a good individual, can be a reasonable strategic choice if based on an informed and reasoned plan. We explained in Bradley v. State, 33 So. 3d 664 (Fla. 2010):

> Trial counsel painstakingly investigated potential mitigation, including mental mitigation material. He strategically determined that presenting all the drug and mental information to the jury would not be beneficial, would open the door to the prosecution's cross-examination concerning it, and would conflict with his theory that Bradley was generally a hard-working, productive member of society who had simply deviated from his generally good character. These informed choices were reasonable strategic decisions. See Card v. State, 992 So. 2d 810, 816 (Fla. 2008) (concluding that counsel reasonably utilized lay testimony to attempt to humanize the defendant); Miller v. State, 926 So. 2d 1243, 1252 (Fla. 2006) (determining that defense counsel reasonably chose not to present certain mental health records via testimony of a psychologist and instead presented the information through sympathetic testimony of defendant's family members); Gaskin v. State, 822 So. 2d 1243, 1248 (Fla. 2002) ("Trial counsel will not be held to be deficient when she makes a reasonable strategic decision to not present mental mitigation testimony during the penalty phase because it could open the door to other damaging testimony."); Rutherford v. State, 727 So. 2d 216, 222-23 (Fla. 1998) (concluding that counsel reasonably made the decision to focus on defendant's "solid, 'Boy Scout' character traits," humanize him, and advance the theory that he was a " 'good ol' fellow' who must have just lost it") (quoting trial court's order); Haliburton v. Singletary, 691 So. 2d 466, 471 (Fla. 1997) (determining that trial counsel's penalty phase strategy to humanize the defendant and not call any mental health experts was not ineffective assistance of counsel).

Id. at 679.

- 25 -

All the positive mitigation trial counsel presented at the penalty phase, which showed Carter to be a good person who rose from an unfavorable childhood to be a successful, kind, responsible, well-liked family member, friend, student, member of the military, and employee, would have been defeated by the negative information concerning his past acts of violence. Thus, as the circuit court found, all the mitigation proposed by Carter, when considered as it must be with the negative information that would have come before the jury, leads to the conclusion that there is no reasonable probability the jury would have recommended or the judge would have imposed a life sentence—a reasonable probability being one sufficient to undermine the Court's confidence in the result. The circuit court also correctly found that counsel was not obligated to change their "good guy," humanizing strategy at the Spencer hearing.

As we held in Bradley, trial counsel, who reasonably presented a humanizing, "good guy" defense during the penalty phase after thorough investigation, did not have an obligation to change that strategy at the Spencer hearing to show the defendant as violent and abusive. 33 So. 3d at 679-80. As in Bradley, the fact that the chosen mitigation strategy did not prevail "does not render the strategy unreasonable or deficient." Id. at 680. Nor does the fact that Carter has now obtained a mental health expert with a different or more favorable opinion render deficient trial counsel's decision not to present the mental health

experts retained at the time of trial.  We explained in <u>Wheeler v. State</u>, 124 So. 3d 865 (Fla. 2013),

> To the extent that Dr. Smith's testimony is more favorable, this Court has repeatedly held that "a defendant cannot establish that trial counsel was ineffective in obtaining and presenting mental mitigation merely by presenting a new expert who has a more favorable report." <u>Wyatt v. State</u>, 78 So. 3d 512, 533 (Fla. 2011); <u>see also</u> <u>Peede v. State</u>, 955 So. 2d 480, 494 (Fla. 2007) ("The fact that Peede produced more favorable expert testimony at his evidentiary hearing is not reason enough to deem trial counsel ineffective.").

<u>Id.</u> at 885.  Counsel cannot be found deficient for relying on the evaluations of qualified mental health experts, "even if, in retrospect, those evaluations may not have been as complete as others may desire."  <u>Jennings v. State</u>, 123 So. 3d 1101, 1116 (Fla. 2013) (quoting <u>Darling v. State</u>, 966 So. 2d 366, 377 (Fla. 2007)).

In this case, Carter has not suggested that the mental health experts retained and relied on by trial counsel were not qualified.  Indeed, this Court has referred to Dr. Harry Krop, one of Carter's experts retained by trial counsel, as "an experienced and well-documented expert."  <u>Floyd v. State</u>, 18 So. 3d 432, 453 (Fla. 2009).  In 2000, we noted that Dr. Krop was "an experienced expert witness who has evaluated over 400 patients to determine competency and mitigation, and has testified on behalf of defendants in over 45 cases."  <u>Patton v. State</u>, 784 So. 2d 380, 392 (Fla. 2000).  Trial counsel in this case was entitled to rely on the retained experts' evaluations and to make a reasoned decision not to present expert testimony that would not be particularly mitigating, but which would, as

Dr. Gomez conceded, open the door to evidence of extremely negative acts committed by Carter in the past.

Based on the record in this case and the circuit court's comprehensive evidentiary hearing, we find that Carter has failed to meet either prong of Strickland necessary to establish ineffective assistance of counsel. Accordingly, relief is denied on this claim.

**Change of Venue**

In Carter's second claim on appeal, he contends that trial counsel was ineffective in failing to move for a change of venue. In supporting such a claim, the defendant "must, at a minimum, 'bring forth evidence demonstrating that the trial court would have, or at least should have, granted a motion for change of venue if [defense] counsel had presented such a motion to the court.' " Dillbeck v. State, 964 So. 2d 95, 104 (Fla. 2007) (quoting Wike v. State, 813 So. 2d 12, 18 (Fla. 2002)); see also Taylor v. State, 120 So. 3d 540, 551 (Fla. 2013), cert. denied, 134 S. Ct. 1009 (2014). We have explained the standard for a change of venue as follows:

> Knowledge of the incident because of its notoriety is not, in and of itself, grounds for a change of venue. The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that the jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom.

Franklin v. State, 137 So. 3d 969, 986 (Fla. 2014) (quoting McCaskill v. State, 344 So. 2d 1276, 1278 (Fla. 1977) (quoting Kelly v. State, 212 So. 2d 27, 28 (Fla. 2d DCA 1968))). The extent and nature of the publicity and the difficulty actually encountered in selecting a jury are critical factors for consideration by the court. Rolling v. State, 695 So. 2d 278, 285 (Fla. 1997). If the defendant shows no undue difficulties in selecting a fair and impartial jury, then no legal basis would have existed for a change of venue—and trial counsel would not have been deficient in failing to move for one.

The circuit court granted an evidentiary hearing on this claim, but the State contends that Carter waived this claim by abandoning it at the evidentiary hearing and presenting no evidence. At the evidentiary hearing, Carter did not question trial counsel about the decision not to file a motion for change of venue. Further, postconviction counsel did not introduce into evidence any of the many news articles that he cites in his postconviction motion as evidence of the prejudicial publicity that he contends required a change of venue. Thus, the circuit court was correct in denying relief in part on the finding that Carter failed to submit any evidence of the alleged inflammatory news articles and stories. However, the circuit court did not deny relief solely on the basis of waiver, but instead ruled on the merits that a fair and impartial jury was selected and that trial counsel had no legal grounds to move for a change of venue. On cross-examination at the

evidentiary hearing, trial counsel White was asked why he did not move for a change of venue. He testified that he did not do so because he believed the law required proof of pervasive absorption of the details of the case into the psyche of the community and a showing of a kind of "circus atmosphere." White said, "We didn't have that." White also testified that he believed an effort had to be made to pick a jury before a motion for change of venue would be warranted.

In denying the claim that trial counsel was ineffective in failing to move for a change of venue, the circuit court found that a significant amount of time elapsed between the crimes and the trial in September 2005, and noted that news coverage in PEOPLE magazine occurred in 2003, and the "America's Most Wanted" television show on which the crimes were featured occurred in 2004. The court found that of the over seventy potential jurors, individual voir dire was conducted with thirty-five who said they had some prior knowledge of the case. Based on the record, the postconviction court concluded that the jurors had limited extrinsic knowledge of the case, none had a sufficient personal connection to infer prejudice, and all jurors with prior knowledge stated unequivocally that they had not formed any opinions and could render a fair and impartial verdict solely on the evidence presented at trial. The circuit court also noted that defense counsel exhausted all peremptories and that Carter approved the final jury that was selected. Thus, the circuit court held that Carter did not meet the test for

ineffective assistance of counsel because the record demonstrates that an impartial jury was seated and that, even if a motion had been made, it would not or should not have been granted. We agree.

In the widely publicized and infamous case of Rolling, we recognized that "pretrial publicity is normal and expected in certain kinds of cases, like this one, and that fact standing alone will not require a change of venue." Rolling, 695 So. 2d at 285. We held that the first prong of the analysis requires that certain factors must be evaluated to determine if a change of venue should have been granted. The second prong of the analysis requires the trial court to examine the extent of difficulty in actually selecting an impartial jury at voir dire. Id. "If voir dire shows that it is impossible to select jurors who will decide the case on the basis of the evidence, rather than the jurors' extrinsic knowledge, then a change of venue is required." Id. "The ability to seat an impartial jury in a high-profile case may be demonstrated by either a lack of extrinsic knowledge among members of the venire or, assuming such knowledge, a lack of partiality." Id.

In a similarly widely publicized case, Foster v. State, 778 So. 2d 906 (Fla. 2000), Foster produced voluminous newspaper articles and television accounts of the crime, most of which were published two years before the trial. Id. at 914. In Foster, similar to the instant case, most of the veniremen stated that they had heard something about the case through the media. As in this case, the trial court

eliminated all those who stated that their fixed opinions would prevent them from reviewing the evidence in a fair manner; and the jurors who were selected all stated they could be fair and set aside what they heard. Id. We held on appeal that a change of venue was not required in Foster because the record did "not indicate that the community was so infected by the media coverage of this case that an impartial jury could not be impaneled, and an impartial jury appears to have been actually seated." Id.

In a postconviction context such as this one, where postconviction counsel failed to demonstrate there was a legal basis for filing a motion for change of venue, and where the record reflects no undue difficulty in selecting an impartial jury, trial counsel is not ineffective in failing to move for a change of venue. See Dillbeck, 964 So. 2d at 104. We also emphasized in Griffin v. State, 866 So. 2d 1 (Fla. 2003), that postconviction counsel must bring forth evidence to demonstrate that there is a reasonable probability that the trial court would have, or at least should have, granted a motion for change of venue if one had been filed. Id. at 12.

The circuit court was correct in finding, based on the record in this case, that if trial counsel had filed a motion for change of venue, there is no reasonable probability that the motion would have, or should have, been granted. The trial court questioned all the jurors individually who responded that they had some prior knowledge of the case. Each one indicated that they could not recall many

specifics of the case and had not formed any opinions about Carter's guilt or innocence.

Juror O'Neill, who served as an alternate, was one of the jurors who was questioned separately. He explained that he did have some familiarity with victim Pafford, who managed some of the Publix stores where O'Neill had shopped. He did not know Pafford as a personal friend, but had only casual contact with him when making purchases. Juror O'Neill said he could put aside what he knew of the case from news articles, and that his knowledge of Pafford would not impact his ability to be fair. Furthermore, alternate juror O'Neill was not called on to deliberate in this case.

It can be seen that the trial court was careful to question the jurors separately, and the record shows that it was not impossible or even difficult to seat a jury that could be fair and impartial and decide the case solely on the law and evidence presented. For this reason, trial counsel was not deficient in failing to file a motion for change of venue. Moreover, Carter has not demonstrated—in light of the record and the case law—that such a motion would have, or should have, been granted. Because Carter failed to provide evidence to support his claim of ineffective assistance of counsel in not moving for a change of venue, and because the record demonstrates that a fair and impartial jury was seated after substantial

individual voir dire in which the jurors confirmed that they would decide the case solely on the evidence presented, the circuit court correctly denied the claim.

## CONCLUSION

For the foregoing reasons, we affirm the circuit court's order denying postconviction relief on all claims.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Duval County,
Lance Manning Day, Judge - Case No. 162004CF000730AXXXM

Frank John Tassone, Jr. of Tassone & Dreicer, LLC., Jacksonville, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, and Charmaine Millsaps, Assistant Attorney General, Tallahassee, Florida,

for Appellee